MURDOCK, Judge.
Nancy G. Smith appeals from the trial court’s judgment finding her 50% permanently partially disabled as a result of an injury she suffered while employed with QHG of Dothan, Inc., a corporation, d/b/a Home Health Services (“QHG”). The trial court also determined that mileage reimbursement was not to be included in the computation of the “average weekly wages” to be used in calculating Smith’s disability benefits under § 25-5-57, Ala. Code 1975.
The trial court held .an ore tenus-hearing on October 31, 2001, at which Smith and the following individuals testified: Marlene Harrell, a company representative for QHG; Myrtice Carr, a vocational expert retained by Smith; and Eric Anderson, a vocational expert retained by QHG. Written reports from both of the vocational experts were admitted into evidence. The trial court also considered the following additional evidence: the deposition testimony of Smith (dated April 1999); the deposition testimony of Dr. J. Paul Maddox, an orthopedic surgeon (dated August 2001); relevant medical and payroll records; an affidavit of Alethia E. Keahey, director of fiscal services for QHG; and a Social Security Administration disability decision in favor of Smith.
At the time of the trial, Smith was 42 years old. In addition to having graduated from high school, Smith had completed three quarters of general curriculum at a community college. Smith earned primarily A’s and B’s in high school; she earned A’s and B’s at the community college as well.
Smith, a certified nursing assistant (“CNA”), began working for QHG as an in-home patient-care provider in March 1996. Smith’s job duties included taking patients’ vital signs, bathing them,. moving them around, and changing their clothes. Smith used her own vehicle to travel to the patients’ homes, and QHG reimbursed her biweekly for her reported mileage by paying her a standard per-mile rate.
On September 3, 1997, Smith suffered an on-the-job injury to her lower back while attempting to assist a patient out of a wheelchair. Thereafter, Smith was diagnosed with a bulging disc and underwent conservative treatment. Smith resigned from her job in November 1997, explaining that, because of her level of pain, she was unable to perform her job duties. After conservative treatment failed to relieve Smith’s pain, she was referred to Dr. J. Paul Maddox, an orthopedic surgeon. Thereafter, Smith underwent two surgical procedures: (1) an “L5-S1 laminotomy, bilateral disc excision, posterior lumbar inner body fusion, and right autogenous iliac *200 crest bone graft” (on August 6, 1998); and (2) an “L5-S1 intertransferous transfusion bilaterally with screw and rod fixation and bilateral iliac crest harvest” (on April 20, 2000). Dr. Maddox explained that the first surgery, a one-level fusion at L5-S1, was unsuccessful resulting in a “nonunion or an unhealed fusion”; the second surgery was successful. In August 2000, Dr. Maddox ordered a functional capacity evaluation (“FCE”) to determine Smith’s physical limitations.[1]
On August 17, 2000, Daniel R. Peters, a physical therapist, conducted the FCE. According to the FCE, Smith demonstrated an ability to work in a sedentary to light-physical functional capacity with the following restrictions: “no squatting,, kneeling, running. Stand/walk FREQ but not CONSTANT.”[2]
Dr. Maddox concurred with the FCE, finding it to be representative of Smith’s work abilities. Dr. Maddox determined that Smith had reached maximum medical improvement on August 17, 2000, and assigned Smith a 12% impairment rating to the body of as whole. Dr. Maddox released Smith to return to work within the limitations of the FCE. Dr. Maddox recognized that, because of lifting limitations, Smith would not be able to return to her job as a CNA at QHG.
Both parties had vocational experts testify at trial. Myrtice Carr, Smith’s vocational expert, opined that Smith was 100% permanently and totally disabled. Carr opined that Smith had a loss of access to the job market of 94% and a loss of earning capacity of 100%. In her vocational report, Carr opined that “[i]t is customary and reasonable to average the two methods to obtain the loss of employability which is measured to be 97%. With only four jobs feasible, this should be considered at 100 percent loss.”
QHG’s vocational expert, Eric Anderson, opined that Smith had a loss of access to the market of 50% and a loss of earning capacity of 17%. In his vocational report, Anderson opined that “Smith’s vocational disability rating ranges ... between 25% to 33.5%.” Anderson testified that Smith had enough work skills to become a medical office assistant, a file clerk, a receptionist, a hospital admitting clerk, and a cashier. Anderson further testified that Smith could receive short-term training to become a pharmacy technician or a cardiac monitor technician, both of which could yield greater wages than Smith’s preinjury job as a CNA.
Smith testified at trial that she takes Vioxx (an anti-inflammatory medication) every day for her back. She also testified that she “[a]t times [has] to take [over-the-counter] pain medicine.” Smith described her pain: “I still have pain. It’s not as bad as before. My legs are bad to cramp. I don’t sleep that good. I sleep on my right side with pillows between my legs. Sometimes I have a good night’s sleep and sometimes I don’t.” On cross-examination, Smith admitted that, although she claims that she is unable to obtain work because of her medical condition, she has not attempted to find work within her work restrictions. She also admitted that she is able to cook meals for: her husband, make up the beds, clean the house, and *201 generally take care of her “household” duties. Smith also drives.
In its judgment, the trial court found, in part:
“5. On September 3, 1997, while working within the scope of her employment with [QHG], [Smith] injured her back lifting a patient from a wheelchair. Dr. J. Paul Maddox, an orthopedic surgeon at Southern Bone & Joint, subsequently performed two surgical procedures to repair the injury: (1) an L5-S1 laminotomy, bilateral disc excision, posterior lumbar inner body fusion and right autogenous iliac crest bone graft; and (2) L5-S1 intertransferous transfusion bilaterally with screw and rod fixation and bilateral iliac crest harvest.
[[Image here]]
“7. At the time of the accident, [Smith’s] average weekly earnings were $258.70. Although [Smith] contended at trial that her average weekly earnings should have included mileage reimbursement expenses paid by [QHG], the court specifically finds that the mileage reimbursements were not included in [Smith’s] W-2 forms and [were] not treated as income for federal income tax purposes. Thus, under Ala. Code §§ 25-5-57(b) and 25-5-1(6), the reimbursements should not be included in [Smith’s] average weekly earnings.
[[Image here]]
“11. [Smith] reached maxmium medical improvement, according to Dr. Maddox, on August 17, 2000. Dr. Maddox assigned [Smith] a 12 percent permanent partial rating to the body as a whole due to her two surgeries. Dr. Maddox released [Smith] to return to work as per the demonstrated eapabilities and limitations outlined in the [FCE] performed by Daniel Peters at Rehab Associates of Dothan on August 17,2001.[3]
“12. According to the FCE, [Smith] demonstrated the physical demands and capabilities of performing sedentary to light work based on her decreased standing and walking tolerances. Mr. Peters documented [Smith] was able to frequently sit, stand and walk, and occasionally bend and climb. He believed she was able to perform some light to medium material handling activities. She demonstrated the ability to carry weights of approximately thirty-five pounds a distance of thirty feet. Further, she was able to perform a torso lift with weights of fifteen pounds occasionally and able to pull twenty pounds of force for a distance of thirty feet. Mr. Peters further documented [Smith] was able to constantly reach and could perform simple grasping, fine work, pushing and pulling and low speed assembly tasks. [Smith] was also qualified to return to fulltime work eight hours per day provided that she not squat, kneel, run, or crawl. Mr. Peters recommended [Smith] alternate sitting and standing every thirty minutes to one hour.
“13. [Smith’s] vocational expert, Myrtice Carr, testified that [Smith] was 100 percent permanently and totally disabled from gainful employment. As stated, her vocational disability evaluation report was admitted into evidence.
“14. [QHG’s] expert, Eric Anderson, expressed his opinions that while [Smith] would be precluded from returning to her past work as a certified nurse assistant based upon the physical restrictions assigned by Dr. Maddox,
*202 she could receive short-term training to become a pharmacy technician or a cardiac monitor technician. These are jobs which yield wages greater than [Smith’s] pre-injury wages as a CNA. It was Mr. Anderson’s further opinion that [Smith] had transferable work skills that would assist her in finding employment as a hospital admitting clerk, as well as other semi-skilled positions within her restrictions.
“Mr. Anderson concluded that [Smith] has lost access to 50 percent of her pre-injury labor market and suffered a loss of earning capacity of approximately 17 percent. This yielded an overall vocational disability rating of between 25 and 33.5 percent.
“It is the conclusion and finding of this court, after having observed the demeanor and testimony of the witnesses; taking into consideration [Smith’s] age, education, training, experience, physical limitations and physical disability ratings; and after considering all of the evidence introduced at the trial, particularly the vocational expert testimony; that [Smith] suffered a 50 percent permanent partial disability and is not permanently, totally disabled.”
Smith contends that the trial court erred, as a factual matter, in finding that she was less than 100% permanently totally disabled. In a workers’ compensation case, “[i]n reviewing pure findings of fact, the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence.” § 25 — 5—81(e)(2), Ala. Code 1975; Ex parte Trinity Indus., Inc., 680 So.2d 262 (Ala.1996) (holding that a trial court’s finding of fact will not be reversed if that finding is supported by substantial evidence, i.e., if that finding is supported by “‘evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved’ ” (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989))).
We also have held that a trial court’s factual finding based upon conflicting ore tenus evidence will not be disturbed on appeal unless that finding is clearly erroneous or manifestly unjust. Blackman v. Gray Rider Truck Lines, Inc., 716 So.2d 698, 700 (Ala.Civ.App.1998). Further, it is the duty of the trial court, which has the opportunity in an ore tenus proceeding, to observe the witnesses and their demeanor, and not the appellate court, to weigh the evidence presented. Id. at 700. As this court stated in Fryfogle v. Springhill Memorial Hospital, Inc., 742 So.2d 1255 (Ala.Civ.App.1998), aff'd, 742 So.2d 1258 (Ala.1999), with respect to a trial court’s finding as to the extent of disability under the Alabama Workers’ Compensation Act:
“It is the duty of the trial court to make some determination as to the extent of disability. In making the determination, the trial court must consider all the evidence, including its own observations, and interpret it to its own best judgment. This court is precluded from weighing the evidence presented before the trial court. We merely examine the record to determine if the conclusion of the trial court is reasonably supported by the evidence, and, if so, whether the trial court has drawn the correct legal conclusions therefrom.... ”
742 So.2d at 1258 (citations omitted).
Section § 25-5-57(a)(4)d., Ala. Code 1975, a part of the Workers’ Compensation Act, provides:
“[A]ny physical injury or mental impairment resulting from an accident, which injury or impairment permanently and totally incapacitates the employee from working at and being retrained for gain- *203 fill employment, shall constitute prima facie evidence of permanent total disability but shall not constitute the sole basis on which an award of permanent total disability may be based.... ”
This court has held that “permanent total disability” is the inability to perform one’s trade and the inability to find gainful employment. Mead Paper Co. v. Brizendine, 575 So.2d 571, 574 (Ala.Civ.App.1990). This two-pronged test is conjunctive, not disjunctive. Id. The burden is on the employee to reasonably satisfy the trial court that he is entitled to recover benefits. Shaw v. Cannon Sline, Inc., 678 So.2d 193 (Ala.Civ.App.1996).
“The question of whether an employee can return to his former trade is basically a threshold issue; if the employee can resume his trade then it is obvious that he is not permanently, totally disabled .... If he is unable to return to his trade, then § 25-5-57 requires the court to find that other employment is unavailable and retraining is not feasible....
“... Therefore, we find that a permanent, total disability is the inability to perform one’s trade and the inability to find gainful employment. The search for gainful employment includes retraining for another job; moreover, a person cannot refuse to be retrained if her or she is a proper candidate for retraining. § 25-5-57(a)(4)d.”
575 So.2d at 574.
In this case, the trial court, after considering all of the testimony and other evidence, determined that Smith was not permanently totally disabled, but was 50% permanently partially disabled. This court’s role is not to reweigh the evidence. We have carefully reviewed the record in this case and have considered all of the evidence contained therein, as well as Smith’s arguments pertaining to that evidence, and we conclude that substantial evidence supports the trial court’s finding that Smith is 50% permanently partially disabled.
Smith also contends that the trial court erred in computing her “average weekly earnings” under § 25 — 5—57(b), Ala.Code 1975. She argues that the mileage reimbursement she received was an “allowance” that should have been included in the computation of her earnings.
As previously stated, Smith used her own vehicle to travel to the patients’ homes. QHG reimbursed her biweekly for her reported mileage by paying her a standard per-mile rate. Smith testified that QHG’s agreement to reimburse her for mileage expense was a consideration for her at the time she took the job. Smith admitted, however, that she paid for her own gas, oil, maintenance, and insurance. Further, Smith admitted that she did not know how much it cost her each week to operate her car during the 52 weeks immediately before the accident.
Smith’s biweekly pay stubs reflect that the mileage-reimbursement payments were separately stated and included in the “total earnings” column. Alethia E. Keah-ey, director of fiscal services for QHG, submitted an affidavit stating that “Ms. Smith’s mileage reimbursements ... were not treated as income to Ms. Smith for federal income tax purposes and not included as income on her W-2 form.”
Section 25-5-57(b), Ala.Code 1975, provides, in part:
“Compensation under this section shall be computed on the basis of the average weekly earnings. Average weekly earnings shall be based on the wages, as defined in Section 25-5-1(6) of the injured employee in the employment in which he or she was working at the time *204 of the injury....”[4]
Section 25-5-1(6), Ala.Code 1975, defines “wages”:
“(6) Wages or weekly wages. The terms shall in all cases be construed to mean ‘average weekly earnings’, based on those earnings subject to federal income taxation and reportable on the Federal W-2 tax form which shall include ... fringe benefits as defined herein.... ‘Fringe benefits’ shall mean only the employer’s portion of health, life, and disability insurance benefits.”[5]
In the present case, the trial court found that Smith’s mileage reimbursements were not included on Smith’s W-2 forms and were not treated as income for federal income tax purposes. This finding is supported by substantial evidence.
Smith argues, however, that notwithstanding the fact that her mileage reimbursements were not included on her W-2 forms, those reimbursements are still properly treatable as earnings for purposes of the Workers’ Compensation Act. Smith’s argument emphasizes the last sentence of § 25-5-57(b), which provides: “Whatever allowances, of any character made to an employee in lieu of wages are specified as part of the wage contract [and] shall be deemed a part of his or her earnings.” In essence, Smith contends that this provision, which did not change with the adoption of the 1992 amendments to the Workers’ Compensation Act, clarifies or supplements the above-quoted provisions of § 25-5-57(b) and § 25-5-1(6) so as to more broadly define the types of receipts intended by the Legislature to be included as part of an employee’s earnings.[6]
QHG states in its brief that the Legislature’s retention of the last sentence in § 25-5-57(b) “arguably creates a conflict” with the other definitional provisions added by the Legislature to §§ 25-5-57(b) and 25-5-1(6) in 1992. QHG urges this court to reconcile this conflict by construing § 25-5-1(6) as a specific limitation on the more general provisions, including the last sentence of § 25-5-57(b).
Whether there is in fact a conflict between the last sentence of § 25-5-57(b), on the one hand, and the remainder of § 25-5 — 57(b) and § 25-5-1(6), on the other hand, is not a question which we must resolve in order to resolve the case now before us. Even if the last sentence of § 25-5-57(b) were to be read as broadening the parameters that would otherwise be established by § 25-5-1(6), the mileage reimbursements at issue in this case would not fall within those broader parameters.
In Ex parte Murray, 490 So.2d 1238 (Ala.1986), our Supreme Court explained that “allowances of any character” under the last sentence of § 25 — 5—57(b) include employer-paid fringe benefits that have a “discernible economic value to the [employee]” that is lost to an employee when he or she is unable to continue the employment following a work-related injury. 490 So.2d at 1241. The Supreme Court reasoned that the employer’s payment of premiums for the employee’s medical, hospitalization, and life insurance policies in that case was “in lieu of wages,” and it included the amount of those payments in *205 the employee’s earnings for purposes of calculating benefits. Id. at 1240.
At issue in Ex parte Murray, however, were payments made by the employer for normal expenses that the employee would have incurred even if not working for the employer, not reimbursements for expenses incurred specially by the employee in order to perform his employment duties. That is not true in the present case. To the extent Smith’s mileage reimbursements did not exceed the costs of operating her own vehicle in the fulfillment of her employment duties, those reimbursements were not accessions to wealth and did not constitute a true economic benefit to her; rather, they were simply reimbursements to Smith for expenses that she incurred only in fulfilling her employment duties and that she would not otherwise have incurred. See Mason v. District of Columbia Dep’t of Employment Servs., 562 A.2d 644 (D.C.1989).
Smith admitted that she paid for the gas and oil used in operating her vehicle, for the insurance associated with operating the vehicle, and for the cost of maintaining the vehicle. Because the vehicle belonged to Smith, any “wear and tear” or depreciation in the value of the vehicle as a result of its use in performing her duties for QHG was borne by Smith. The record contains no evidence that Smith’s mileage reimbursements exceeded those expenses. The burden of proving earnings and average weekly wages for purposes of computing benefits under the Workers’ Compensation Act is the employee’s. Slay Transportation Co. v. Miller, 702 So.2d 142 (Ala.Civ.App.1997). The trial court therefore did not err in refusing to include those reimbursements in Smith’s earnings.
The judgment of the trial court is due to be affirmed.
AFFIRMED.
YATES, P.J., and CRAWLEY, THOMPSON, and PITTMAN, JJ., concur.

. In March 1998, an FCE had been ordered by a different physician to determine Smith’s physical limitations at that time; however, the results of that FCE were "invalid” based on a determination that Smith had exerted "submaximal effort.”

. Under the FCE, the allowable percentage of the day permitted for specified activities is divided into four categories: "never” (0% of the day); "occasional” (1-33% of the day); "frequent” (34-66% of the day); and "constant” (67-100% of the day).

. It is undisputed that Daniel Peters at Rehab Associates of Dothan performed the FCE on August 17, 2000 — not August 17, 2002.

. The second sentence in the quoted portion of § 25 — 5—57(b) was added as part of the 1992 amendments to the Workers’ Compensation Act. See 1992 Ala. Acts, Act No. 92-537, § 17.

. Section 25-5-1(6) as quoted in the text, was added to the Workers' Compensation Act by the 1992 amendments thereto. See Ala. Acts 1992, Act No. 92-537, § 2.

. Unlike our review of a purely factual finding, our review of a legal issue is without a presumption of correctness in favor of the trial court. Ala.Code 1975, § 25-5-81(e)(1).