The **GEORGE HYMAN CONSTRUCTION COMPANY, Petitioner,**

v.

**DISTRICT OF COLUMBIA DEPARTMENT OF EMPLOYMENT SERVICES, Respondent.**

**John T. Rose, Intervenor.**

**No. 84–1226.**

District of Columbia Court of Appeals.

Argued April 23, 1985.

Decided August 16, 1985.

Stanley J. Brown, Washington, D.C., with whom Alice L. Covington, Washington, D.C., was on the briefs, for petitioner.

Beverly J. Burke, Asst. Corp. Counsel, Washington, D.C., with whom Inez Smith Reid, Corp. Counsel, John H. Suda, Principal Deputy Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on statement in lieu of brief, for respondent.

Allen J. Lowe, Washington, D.C., with whom Peter J. Vangsnes, Washington, D.C., was on the brief, for intervenor.

Before PRYOR, Chief Judge, and FERREN and BELSON, Associate Judges.

BELSON, Associate Judge:

The District of Columbia Department of Employment Services (DOES) determined that claimant worker's myocardial infarction was an injury arising out of employment and that claimant is therefore eligible for workers' compensation pursuant to D.C.Code §§ 36–301 to –345 (1981 & 1984 Supp.). Petitioner George Hyman Construction Company challenges both that determination and DOES' computation of

claimant's average weekly wage under *id.* § 36–311(a)(4). We affirm.

## I

Claimant, John T. Rose, filed a workers' compensation claim for disability caused by a myocardial infarction that occurred while he was working for the George Hyman Construction Company. Hyman controverted claimant's right to compensation, contending that claimant's myocardial infarction was not an "accidental injury ... arising out of and in the course of employment." D.C.Code § 36–301(12).

Claimant testified before the hearing examiner that he was born in June 1922, and had had a "heart attack" in 1977. He explained that on June 8, 1983, he was working for petitioner as a cement mason, his profession since 1947. On that day, he worked in the basement of a building under construction. The basement had a 10 foot ceiling. The atmosphere there was warm and muggy. Claimant was "patching"—filling up and smoothing over holes in concrete. While standing on a scaffold, he patched the area of the wall where it meets the ceiling. He patched from the hours of 7:00 or 7:30 a.m. to 2:00 p.m., with two breaks.

At 2:00 p.m., a co-worker came to claimant and told him that he was wanted by Mr. Miller, a cement mason foreman, to bullfloat concrete on the 5th floor. Bullfloating is a process of finishing poured concrete by sliding an aluminum instrument over its surface. Claimant carried all his tools, weighing about 50 pounds, and walked up 5 flights of stairs. The cement had already been poured when claimant arrived on the 5th floor, so he immediately began bullfloating. Claimant testified that although it is not difficult to bullfloat concrete that has just been poured, concrete sets quickly in the summer, and it was hard to work the bullfloat on the 5th floor.

After working the bullfloat for approximately 30 minutes, claimant began to experience pain in his chest. He stopped work, was driven home, and was then taken to the hospital by ambulance. He was diagnosed as suffering from a myocardial infarction and remained in the hospital for 2 weeks.

Claimant submitted the deposition of Jack Segal, M.D. Dr. Segal concluded that there was a causal relationship between claimant's infarction and his work. That opinion was based on claimant's description of strenuous work activity and hot weather.

David Miller, claimant's foreman, testified for Hyman to a different version of events. He stated that the basement was cool—at 60 or 65 degrees—and well ventilated. Claimant did not have to patch at the ceiling, and would have used the scaffold if he needed to do so. Miller testified that he went to the basement to get claimant up to the second floor. They took their time, walked up a ramp and one flight of stairs. Claimant's tools weighed only 15 pounds. When they arrived at the second floor, the concrete had not yet been poured, and claimant spent 30 to 40 minutes talking with co-workers. When claimant bullfloated the concrete it was soft. Even when the cement has set, it is not hard to work the bullfloat, according to Miller.

Harry Worth, another cement mason foreman, also testified that bullfloating is easy work, and if there is a need to reach higher than the head to patch, a scaffold is used.

The temperature on that day, recorded at National Airport, was 68–71 degrees between 7:00 and 9:00 a.m., and the humidity 63–57 percent. Between 2:00 and 3:00 p.m., the temperature was 80 degrees and the humidity 42–38 percent.

Hyman called Gerald Shugoll, M.D., a cardiologist, to testify at the hearing. The record also contains two of his medical reports, dated November 28, 1983, and January 24, 1984. The November 1983 report concluded that the physical demands of the work on June 8 "would have to be strongly considered as a precipitating element in the occurrence of his myocardial infarction."

The report was based on the history claimant gave of the circumstances that preceded his infarction that day. Dr. Shugoll considered claimant's version to indicate that he was involved in exertion on that day that was unusual for him.

In the January 1984 report, Dr. Shugoll reached the opposite conclusion. He based this opinion on the assumption that the facts were much like those described by Foreman Miller. At the hearing, Dr. Shugoll repeated this opinion, based on Miller's version of the events of June 8.

In her Proposed Compensation Order, the hearing examiner found that claimant was a credible witness, and that his description of his work day at the hearing and to Dr. Shugoll reflected the events of June 8. She observed that Dr. Segal's deposition was basically consistent with Dr. Shugoll's opinion. She also accepted Dr. Shugoll's opinion in his November 1983 report as the most credible. The hearing examiner concluded that claimant had established that his myocardial infarction had arisen out of his employment on June 8, 1983, and that he has been temporarily totally disabled since that time.

The Director of DOES affirmed the hearing examiner's Proposed Compensation Order. The Director, however, rejected the hearing examiner's view that no unusual exertion need have occurred for there to have been an injury under the Act. The Director instead adopted the standard that when the claimant suffers a myocardial infarction and there is proof of preexisting arteriosclerosis, the claimant must prove that exertion unusual for the employee precipitated the infarction. The Director determined that the record supported such a conclusion.[1]

## II

Petitioner contends that there is no medical evidence in the record supporting a conclusion that claimant's work precipitated his myocardial infarction and that the record demonstrates that no unusual exertion was involved on June 8, 1983.[2] Petitioner also argues that the Department should have used a different method to compute claimant's average weekly wage. We disagree with both contentions.

Petitioner's first argument on appeal is that the testimony of Dr. Shugoll, relied on by the hearing examiner, is insufficient support for a finding of eligibility because his opinion was based on claimant's description of events given in November 1983, which was at variance with claimant's testimony at the hearing. Petitioner directs our attention to discrepancies in three respects: the weather conditions, the type of reaching, and the degree to which claimant was hurried.

Petitioner observes that Dr. Shugoll's November 1983 report states that claimant was working under "hot conditions," as opposed to claimant's trial testimony that "it was warm, but we had worked warmer days than that." At the hearing, Dr. Shugoll stated that 80 degrees with approximately 38 percent humidity would not of itself stress the heart inordinately. According to petitioner, Dr. Shugoll had the impression in November 1983 that claimant was working on the ceiling, while claimant testified that he was working on the area where the wall meets the ceiling. Lastly, petitioner suggests that claimant explained to Dr. Shugoll that he had to rush upstairs and was hurried, but at the hearing, claimant merely stated that he walked up the stairs and did not state that he was rushed in any other way.

**1.** Provisions governing review of compensation orders by the Mayor or his designee are set forth at D.C.Code § 36–322 and 29 D.C.Reg. 5537–68 (1982) (to be codified at 36 DCMR § 3600). The administrative procedures concerning the Director's review are not at issue here.

**2.** Neither petitioner nor claimant questions on appeal the standard adopted by the Director that an unusual exertion must precipitate the infarction. We intimate no opinion on the correctness of that standard.

We disagree that claimant's testimony at the hearing constituted a significant departure from the facts relied on by Dr. Shugoll in his November 1983 report. The hearing examiner specifically concluded that "claimant was a credible witness and I believe that claimant's testimony at the hearing and the history he gave to Dr. Shugoll reflect what occurred on June 8, 1983." The hearing examiner accepted claimant's testimony that it was humid in the basement. Dr. Shugoll explained that humidity is a more important factor than heat. The hearing examiner credited claimant's testimony that he would have to reach above his head to work on the area where the ceiling meets the walls. Dr. Shugoll's report notes that claimant "was working on ceiling which is more strenuous than average," and he testified that he had the impression that claimant was working with his hands over his head a large portion of the time. To a significant degree— on the question of whether claimant's hands were over his head—the two versions are consistent.

Lastly, the hearing examiner accepted claimant's testimony and history given to Dr. Shugoll that he was under stress. Although claimant used the words "walked up the stairs" instead of "rushed," the full context of his testimony supports the hearing examiner's finding. Claimant explained that he was told to go up to the 5th floor because they were pouring concrete. Once there, the fact that the concrete was already setting required claimant to go to work immediately. Clearly claimant's testimony demonstrates a pressured and rushed situation.

█ Therefore, we hold that the agency's finding that claimant's myocardial infarction arose out of his employment is supported by substantial evidence in the record.[3]

3. The Workers' Compensation Act, D.C.Code § 36–322(c), provides for review of compensation orders by the District of Columbia Court of Appeals pursuant to the District of Columbia Administrative Procedure Act, D.C.Code §§ 1–1501 to 1542. We will set aside findings and

### III

Petitioner submits that DOES miscalculated claimant's average weekly wage. We disagree and hold that DOES' construction of the workers' compensation statute was reasonable, and not arbitrary or capricious or an abuse of discretion.

Benefits under the Act are set in reference to the claimant's average weekly wage. D.C.Code § 36–311 (1981). For employees reimbursed by the hour, such as the claimant here, the Act provides the following formula:

If at the time of the injury the wages are fixed by the day, hour, or by the output of the employee, the average weekly wage shall be computed by dividing by 13 the total wages the employee earned in the employ of the employer in the 13 consecutive calendar weeks immediately preceding the injury. If the employee has been in the employ of the employer less than 13 weeks, then his "total wages" referred to in the preceding paragraph shall be the amount he would have earned had he been so employed by the employer the full 13 calendar weeks immediately preceding the injury and had worked, when work was available to other employees, in a similar occupation.

*Id.* § 36–311(a)(4).

The Proposed Compensation Order set forth a computation of claimant's average weekly wage. Petitioner's unemployment began on a Wednesday; claimant's wages were paid by the hour. The parties agreed that Hyman's work week began on Wednesdays. Claimant worked for petitioner for 5 consecutive work weeks prior to June 8, 1983. Claimant did not work a full 40 hours for each of those 5 weeks. His weekly work hours ranged from a high

conclusions of the agency when they are, *inter alia,* "[u]nsupported by substantial evidence in the record." *Id.* § 1–1510. *See e.g. Saunders v. Police & Firemen's Retirement & Relief Board,* 444 A.2d 16, 18 (D.C.1982).

of 47.5 hours (regular plus overtime) to a low of 16.5 hours. Claimant's last day, June 8, 1983, was on a Wednesday, the first day of the sixth work week. The hearing examiner calculated claimant's average weekly wage by dividing by 5 the total amount of pay received for the 5 work weeks preceding the injury, for a figure of $503.30.

Petitioner suggests that claimant's average weekly wage should be based on either all of his 1982 earnings, or on a 6 week instead of a 5 week calculation.

Because claimant did not work for petitioner for the 13 weeks immediately preceding his injury, the statute required that claimant's average weekly wage be calculated on the wages he would have earned if he had been employed for the full 13 calendar weeks immediately preceding the injury when work was available to other employees in a similar occupation. Neither petitioner nor claimant submitted direct evidence of what those earnings would have been. DOES applied a formula used previously in another workers' compensation determination. *Savoy v. Vienna Equipment Company,* H & AS No. 83–39; OWC No. 0002550 (July 21, 1983).

■■■ In *Savoy,* as here, DOES calculated the average weekly wage of the claimant by referring to the amount earned for the weeks actually worked by the claimant, although less than 13 weeks. In *Savoy,* DOES, in effect, placed upon the employer the burden of establishing that no work or less work would have been available to "other employees in a similar occupation" during that portion of the 13-week period preceding the injury that came before Savoy's employment. Upon the employer's failure to carry that burden, DOES assumed that Savoy would have worked during the entire 13-week period at the same rate or in the same pattern that he worked during the period of 7 weeks that spanned his actual employment. Conversely, if Savoy wished to establish an average weekly wage greater than that, he had the burden to submit evidence concerning how much work was available to similar employees during the 13-week period. We view the *Savoy* approach as reasonable and approve of its application here. *See Gomillion v. D.C. Department of Employment Services,* 447 A.2d 449, 451 (D.C.1982) (court accords great weight to any reasonable construction of regulatory statute by agency charged with its administration); *accord Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965) (great deference to agency construction). Given the paucity of the record and the absence of any evidence that would serve as the basis for use of a different method, we conclude that reference to claimant's actual earnings leads to a fair computation even though based on a period shorter than 13 weeks.[4]

■■■ Petitioner argues that even if DOES is permitted to refer to claimant's shorter work record directly preceding claimant's injury, DOES erred by considering 5 instead of 6 weeks of employment. We conclude that DOES reasonably construed the statute under the circumstances. DOES calculated claimant's work history by starting at the first full employer work week preceding the injury. This is a reasonable interpretation of the statute which refers to the "full 13 calendar weeks immediately preceding the injury." That statutory language suggests that the week of injury is not included in the calculation when the injury occurs sometime during the week. Furthermore, DOES applied a fair standard of calculation by work weeks rather than calendar weeks since the record here listed claimant's earnings by work week. It would have been patently

4. Petitioner suggests that we should remand to permit DOES to receive additional evidence on what claimant would have earned during the 13-week period. We decline to do so. Petitioner had the opportunity to introduce such evidence at the hearing, but did not. Petitioner offers no reasonable ground for such failure. *See* D.C.Code § 36–322(b)(3) (Court of Appeals may order Mayor to take additional material evidence when reasonable grounds exist for failure by party to adduce such evidence at hearing before Mayor).

inconsistent with the statute, as well as unfair, to dilute claimant's earning record by factoring in as a full week the small portion of the sixth work week in which claimant actually worked and received one day's pay. Thus, the method of calculation used by DOES is in these circumstances a fair and rational estimate of claimant's average weekly wage.

*Affirmed.*