**UNITED PARCEL SERVICE and Liberty Mutual Insurance Company, Petitioners,**

v.

**DISTRICT OF COLUMBIA DEPARTMENT OF EMPLOYMENT SERVICES, Respondent,**

and

**Randy Brant, Intervenor.**

No. 02–AA–1288.

District of Columbia Court of Appeals.

Argued Sept. 24, 2003.

Decided Oct. 30, 2003.

Donald P. Maiberger, Rockville, MD, for petitioners.

Charles L. Reischel, Deputy Corporation Counsel at the time the statement was filed, and Arabella W. Teal, Interim Corporation Counsel, filed a statement in lieu of brief for respondent.

Bruce M. Bender, Rockville, MD, for intervenor.

Before SCHWELB and REID, Associate Judges, and PRYOR, Senior Judge.

SCHWELB, Associate Judge:

On October 28, 2002, the Director of the District of Columbia Department of Employment Services (DCDOES), reversing a Compensation Order issued by an Administrative Law Judge (ALJ), held that, in calculating claimant-intervenor Randy Brant's average weekly wage (AWW) for purposes of determining the amount of workers' compensation to which Brant was entitled, two weeks during which Brant participated in a strike should be excluded. Brant's employer, United Parcel Service (UPS) and the employer's carrier, Liberty Mutual Insurance Company (collectively "the employer"), have petitioned this court to review the Director's decision. The employer contends that the Director's decision is contrary to the language and purpose of the then applicable provision of the District's Workers' Compensation Act (WCA), D.C.Code § 36–311(a)(4) (1997).[1] We disagree and affirm.

## I.

## PROCEEDINGS BEFORE THE AGENCY

On October 29, 1997, Brant was employed by UPS as a package delivery driver. On that day, he suffered injury from a fall after stepping from his delivery truck. He never returned to his former job. Brant filed a timely claim for workers' compensation.

"Benefits under the Act are set in reference to the claimant's [AWW]." *George Hyman Constr. Co. v. District of Columbia Dep't of Employment Servs.*, 497 A.2d 103, 107 (D.C.1985) (hereinafter *George Hyman*); D.C.Code § 32–1511(a) (2001). Following the accident, Brant received workers' compensation benefits[2] based on

---

1. This provision was amended in 1999, and the revised version is now codified in D.C.Code § 32–1511(a)(4) (2001).

2. From October 29, 1997 to January 13, 2000, Brant received temporary total disability benefits. He subsequently received temporary partial disability benefits.

an AWW which excluded from consideration two weeks during which Brant participated in a strike. At the hearing before the ALJ, the employer contended that Brant had been overpaid. The employer relied on the text of D.C.Code § 36–311(a)(4) which provided, in pertinent part, that the AWW "shall be computed by dividing by [thirteen] the total wages the employee earned in the employ of the employer in the [thirteen] consecutive calendar weeks immediately preceding the injury."[3]

It is undisputed that while the union was on strike, Brant honored the union's picket line and did not report to work. The employer also presented testimony that, during the strike, work would have been available to Brant at UPS' Maryland facility if he had been willing to cross the picket line, as a number of other drivers had done. The ALJ credited this testimony, and he concluded that the time during which Brant was on strike must be included in "the [thirteen] consecutive calendar weeks immediately preceding the injury."

Brant sought review of the ALJ's decision by the Director of DCDOES. The Director reversed the ALJ's decision, ruling in pertinent part as follows:

It is undisputed that during the weeks of August 3 through August 23, 1997, a labor strike against Employer occurred. At the hearing, Claimant contended that he was on leave during the week of August 9, 1997 and then was on strike from August 16 through August 23, 1997. Claimant asserted that the two strike weeks should be excluded from the average weekly wage calculation, as he had no control over his ability to work and work was not available to him. Employer countered by arguing that during those two weeks work was available, unionized employees did show up for work at the Maryland facility and if Claimant had showed up at the facility, he could have worked.

On this issue, the Director has previously held that the calculation of an employee's average weekly wage does not include the weeks that the employee was on strike. *See Thomas v. Washington Gas Light Co.*, Dir. Dkt. No. 88–11 (May 18, 1995). Thus, the two weeks that Claimant was on strike should not have been included in the calculation of his average weekly wage. Thus, the portion of the Compensation Order that dealt with Claimant's average weekly wage must be remanded to the Administrative Judge to recalculate Claimant's average weekly wage.[4]

**3.** The revised statute, D.C.Code § 32–1511(a)(4) (2001), substitutes "twenty-six" for "thirteen" in the foregoing calculus. The effective date of the new legislation, D.C. Law 12–229, 46 DCR 891, was April 16, 1999, and all parties apparently agree that this case must be decided pursuant to the provisions of the earlier version.

**4.** In the *Thomas* case, which was cited and relied upon in the foregoing passage, the Director held:

To calculate average weekly wage, the Hearing Examiner would normally combine all wages earned in a thirteen (13) week period and divide by thirteen (13), in order to get a fair and equitable wage for both the claimant and the employer. However, to use the thirteen week period in this case would be unjust and inequitable. The claimant was out on strike for the eleventh (11th), twelfth (12th), and thirteenth (13th) week, so using all thirteen weeks does not result in a true reflection of claimant's average weekly wage.

Distinguishing *Jones v. Peter Bratti Assocs.*, H & AS No. 84–268, which involved seasonal workers, the Director in *Thomas* went on to explain:

The only reason why an average weekly wage for seasonal workers is not constructed is because it would be too speculative to predict what a seasonal worker might earn. However, in this case the claimant's wages

In conformity with the earlier decision in *Thomas*, the Director sustained Brant's position. In asking this court to review the Director's decision, the employer's sole claim is that the weeks during which Brant was on strike should have been included in determining Brant's AWW.

## II.

### LEGAL ANALYSIS

A. *Standard of review.*

█ Our now-familiar standard of review of agency decisions in workers' compensation cases is governed by the District's Administrative Procedure Act. D.C.Code §§ 2–501,–510, *et seq.* (2001). *See* D.C.Code § 32–1522(b)(3) (2001); *George Hyman*, 497 A.2d at 107 n. 3; *cf. Chevron, USA v. Natural Res. Def. Council*, 467 U.S. 837, 843 n. 11, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). We must determine first, whether the Director's findings are supported by substantial evidence on the record as a whole; and second, whether the Director's conclusions flow rationally from those findings and comport with the applicable law. *See, e.g., Red Star Express v. District of Columbia Dep't of Employment Servs.*, 606 A.2d 161, 163 (D.C.1992). For purposes of the present appeal, the facts are not in dispute, and the sole question before us is one of law, namely, whether, given the evidentiary

findings of the ALJ, the Director properly excluded from the AWW calculus the period during which Brant was on strike.

█ "It is emphatically the province and the duty of the judicial department to say what the law is." *Harris v. District of Columbia Office of Worker's Comp.*, 660 A.2d 404, 407 (D.C.1995) (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803)). Accordingly, our review of the Director's legal conclusions is *de novo. Belcon, Inc. v. District of Columbia Water & Sewer Auth.*, 826 A.2d 380, 384 (D.C.2003).[5] Recognizing agency expertise, however, we "accord[ ] great weight to any reasonable construction of [a] regulatory statute by [the] agency charged with its administration." *George Hyman*, 497 A.2d at 108; *see also Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). Indeed, we will defer to an agency's interpretation of a statute that it administers "so long as it is not plainly wrong or inconsistent with the legislature's intent." *Red Star Express*, 606 A.2d at 163 (citation omitted); *see also Totz v. District of Columbia Rental Accommodations Comm'n*, 412 A.2d 44, 46 (D.C.1980) (per curiam).

Finally, the deference that courts owe in such cases "is at its zenith where the [agency's] administrative construction has been consistent and of long standing." *James Parreco & Son v. District of Co-*

---

are consistent. Therefore, the only equitable way to arrive at claimant's average weekly wage is for the Hearing Examiner to calculate the first ten weeks and divide by ten. The District of Columbia Court of Appeals in *George Hyman Construction Company v. Department of Employment Services*, 497 A.2d 103, 108 (D.C.1985), held that it is possible to deviate from the thirteen week period in order to obtain a fair and equitable average weekly wage.
In our view, the Director's description in *Thomas* of the holding in *George Hyman* is

somewhat overstated. See pp. 869–70, *infra.* Nevertheless, for reasons stated in this opinion, the next-to-last sentence in the quoted passage, which contains the gravamen of the Director's holding, is entirely reasonable quite aside from *George Hyman*.

5. "Since the Director has final responsibility within the agency for interpreting the statute the agency administers, the Director [also] reviews *de novo* the [ALJ's] legal conclusions." *Vieira v. District of Columbia Dep't of Employment Servs.*, 721 A.2d 579, 582 (D.C. 1998).

lumbia Rental Hous. Comm'n, 567 A.2d 43, 48 (D.C.1989); *Atwater v. District of Columbia Dep't of Consumer & Regulatory Affairs,* 566 A.2d 462, 468 (D.C.1989). In the present case, the Director's position with respect to the question of law now before us has been consistent since the *Thomas* case decided by the Director eight years ago.

## B. *The statutory language.*

█ As we have previously noted, Brant's AWW was to be computed by "dividing by [thirteen] the total wages [he] earned in the employ of the employer in the [thirteen] consecutive weeks immediately preceding the injury." D.C.Code § 36–311(a)(4). "[T]he words of the statute should be construed according to their ordinary sense, and with the meaning commonly attributed to them." *Parreco,* 567 A.2d at 46 (citing *Peoples Drug Stores, Inc. v. District of Columbia,* 470 A.2d 751, 753 (D.C.1983) (en banc)). Arguably, Brant was in UPS' employ during the weeks of the strike, in which case a rigidly literal construction of the statute [6] might be viewed as suggesting that a period during which the employee was on strike (or, indeed, *any* period during the thirteen weeks when the employee did not work) should be included in the AWW calculus.

In this instance, however, rigorous literalism would surely lead to incongruous or absurd results. Suppose that an employee, having exhausted his leave, lost his wife and children, as well as his home, in a fire, that he was unable to work for four weeks, and that he was compelled to take leave without pay. Workers' compensation is to be so calculated as to "produce an honest approximation of claimant's probable future earning capacity." 5 ARTHUR LARSON, LARSON'S WORKERS' COMPENSATION LAW § 93.01[1][e], at 93–11 (2003); *see also Alexander v. Portland Natural Gas,* 778 A.2d 343, 347 (Me.2001) (explaining that the AWW "is intended to provide a fair and reasonable estimate of what the employee in question would have been able to earn in the labor market in the absence of a work-injury"). This purpose would obviously be thwarted if the benefits available to the bereaved father in the foregoing hypothetical were to be calculated by including his earnings during the period of enforced absence—namely, zero.

"We must not, of course, make a fetish out of plain meaning." *Parreco,* 567 A.2d at 46.

[I]t is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning.

*Id.* (quoting *Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir.) (Learned Hand, J.), *aff'd,* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945)). In the present context, "sympathetic and imaginative discovery" of the AWW cannot be accomplished by simply adding up the amounts paid to the claimant over the thirteen weeks and dividing by thirteen, without giving any consideration to what occurred during the thirteen weeks. *Cf.* 5 LARSON § 93.01[1][e] at 93–12 (criticizing, in this context, the "exaltation of medieval word-worship over fairness").

---

**6.** We note that, in its brief, the employer has not cited case law supporting a "plain language" approach to the construction of statutes. At oral argument, however, the issue was raised by the court, *sua sponte,* and both counsel addressed it. Although we are not required to consider claims first presented at oral argument, *In re Shearin,* 764 A.2d 774, 777–78 (D.C.2000), this issue is of sufficient importance that we think it appropriate to address it.

In *George Hyman*, the claimant worked for the employer for five weeks and one day prior to his injury. The statute applicable to this situation provided in pertinent part:

If the employee has been in the employ of the employer less than [thirteen] weeks, then his "total wages" referred to in the preceding paragraph shall be the amount he would have earned had he been so employed by the employer the full [thirteen] calendar weeks immediately preceding the injury and had worked, when work was available to other employees, in a similar occupation.

D.C.Code § 36–311(a)(4) (1981). The employer argued, *inter alia*, that because the claimant had worked all or part of six weeks, all six weeks should be considered in determining what he would have earned in thirteen weeks and in computing his AWW. The agency rejected the employer's contention, and considered, for purposes of calculation of the AWW, only the five full weeks that the claimant had worked. This court affirmed, concluding that the agency "applied a fair standard of calculation by work weeks rather than calendar weeks," and that it would be "patently inconsistent with the statute, as well as unfair, to dilute claimant's earning record by factoring in as a full week the small portion of the sixth work week in which claimant actually worked [one day] and received one day's pay." *George Hyman*, 497 A.2d at 108–09.

Although the issue in *George Hyman* differs from the one presented in this case, the court's decision is significant here for two reasons: first, the court rejected a yardstick which would obviously have distorted the claimant's future earning capacity; and second, it focused on the need for an equitable outcome that provided "a fair and rational estimate of claimant's average weekly wage." *Id.* at 109.

The court's emphasis in *Hyman* on fairness is not subject to criticism as an exercise in judicial activism. On the contrary, the court in *Hyman* was faithful to the purpose for which the WCA was passed. "[W]orkers' compensation statutes should be liberally construed to achieve their humanitarian purpose." *Vieira*, 721 A.2d at 584 (citations omitted). We quote from the leading commentary:

The concept of fairness reappears in the final criterion by which to arrive at an average weekly wage when other tests cannot fairly be used. The usual formulation speaks of a wage that fairly represents claimant's earning capacity.... [U]nspecific as this test is, it is much better than a technical test that methodically produces demonstrably inequitable results.

5 LARSON § 93.01[1][e], at 93–15.

### C. *Participation in a strike.*

The employer's principal contention before this court is that Brant voluntarily absented himself from work while his union was on strike, and that because he could have worked during that period but did not, the time that he was on strike should be included in the thirteen weeks from which the AWW is calculated. Recognizing that our standard of review of the Director's determination is deferential, see pages 5–6, *supra*, the employer nevertheless claims that the Director's decision in Brant's favor is unreasonable and erroneous as a matter of law. We disagree.

The issue is one of first impression for the courts of the District of Columbia. As we have seen, however, the position taken here by the employer was rejected by the Director both in *Thomas* and in the present case. The Director's position is supported by persuasive authority from other jurisdictions.

In *Monterey Coal Co. v. The Indus. Comm'n*, 79 Ill.2d 334, 38 Ill.Dec. 175, 403 N.E.2d 263 (1980), the Supreme Court of Illinois was called upon to decide "whether the claimant's [AWW] should be computed to include the [sixteen] weeks spent on strike." *Id.* at 264. The court held that strikes were "unavoidable causes" within the meaning of Illinois' WCA:

> [W]e refuse to confront the individual employee with the dilemma of choosing between, on the one hand, participating in a strike and thus risking a substantial reduction in workmen's compensation benefits should he be injured within the ensuing year and, on the other hand, declining to participate in a strike and thereby facing fines and perhaps expulsion from the union.

*Id.* at 265. Citing *NLRB v. Allis–Chalmers Mfg. Co.*, 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967), the court pointed out in *Monterey* that a union has the authority to discipline its members for strike-breaking, and that "the power to expel or fire strikebreakers is essential if the union is to be an effective bargaining agent." *Id.* The court concluded that

the claimant's absence due to participation in a strike was an unavoidable cause within the meaning of the Workmen's Compensation Act. When confronted with the irreconcilable choices previously discussed, the claimant had, practically speaking, no alternative but to participate in the nationwide mine workers strike. It would not be fair or just to subject him to penalties no matter which choice he made.

*Id.* at 266;[7] *accord, Hawthorne v. Dir., Office of Workers' Comp. Programs*, 844 F.2d 318, 320 (6th Cir.1988) (holding that sum of claimant's earnings "does not accurately and fairly approximate his annual earning capacity because it does not take into account time lost in the year prior to the injury on account of a strike"); *Rakie v. Jefferson & Clearfield Coal & Iron Co.*, 262 Pa. 444, 105 A. 638, 639 (1918) (apparently holding, for workers' compensation purposes, that where a coal mine was closed on account of a labor dispute, an employee's "idleness during this period was not due to any fault of his own," and that deduction of the days missed due to the labor dispute was proper);[8] *cf. Hartley v. Liberty Mut. Ins. Co.*, 197 Tenn. 504, 276 S.W.2d 1, 3 (1954).[9]

---

**7.** The court noted that the strike was lawfully authorized by the union, and left open the question whether the same result would be obtained in the event of an illegal strike.

**8.** The court's opinion in *Rakie*, which is somewhat cryptic, was explained by the Supreme Court of Illinois in *Monterey*, 38 Ill.Dec. 175, 403 N.E.2d at 266.

**9.** In *Hartley*, in a somewhat unclear passage, the Supreme Court of Tennessee appeared to differentiate between various kinds of strikes, but the court's language could also be construed as holding participation on a strike to be a voluntary act for workers' compensation purposes:

> The average weekly wage of an employee should not, and is not, decreased for reasons over which he has no control, such as

closing a plant for repairs (as in the instant case), occasional "suspension of operations due to bad weather," unforeseen shortage of material, "lack of orders, lack of cars, slack season," etc. It is observed that all of the foregoing are occasions and conditions resulting in the cessation of operations by the employer, and should not be considered in determining the average weekly wage of an injured employee. But a strike, in which the injured employee voluntarily participates, does not fall within the same category. The law does not recognize it as such. A "strike" could be a voluntary "layoff" that is beyond the pale of the law, such as so-called "wild cat" strikes, unauthorized "jurisdictional strikes," and others which serve only the mere whim and caprice of a few persons without regard to the interest of fellow employees or the employer. The strike in the instant case was due

If taken to its logical conclusion, the employer's position leads to altogether unacceptable, if not absurd, results. If the strike had lasted all thirteen weeks, and if Brant had refused to cross the picket line, he would, under the employer's logic, be entitled to no benefits at all. Although counsel for the employer asserted that this should not be the result of a thirteen-week strike, he was unable to suggest a reasonable limiting principle, and so are we.

## III.

## CONCLUSION

Especially in light of our deferential standard of review, we are not prepared to leave Brant and others similarly situated with the Hobson's choice either to cross his union's picket line and risk expulsion or other disciplinary action or to suffer a significant reduction in workers' compensation benefits. We are satisfied, as was the Director in *Thomas*, that "using all thirteen weeks does not result in a true reflection of claimant's average weekly wage." Accordingly, the Director's decision in the instant case is

*Affirmed.*[10]

---

to the failure of the Union to negotiate a satisfactory contract with the Sells Lumber Company.
276 S.W.2d at 3.

10. The employer relies on *The Washington Post Co. v. Dist. Unemployment Comp. Bd.*, 379 A.2d 694 (D.C.1977). In that case, which involved a claim for *unemployment* compensation, the court held that a member of a nonstriking union who refused to cross a picket line at his place of employment, was ineligible for benefits. *See also Amer. Broad. Cos., Inc. v. District of Columbia Dep't of Employment Servs.*, 822 A.2d 1085, 1087–90 (D.C.2003). The result in the *Washington Post* case, however, was controlled by D.C.Code § 46–310(f) (1973), which by its terms disqualified from benefits any individual who was unemployed "as a direct result of a labor dispute still in active progress …." The WCA contains no comparable provision. *See also Monterey*, 38 Ill.Dec. 175, 403 N.E.2d at 264–65, recognizing the same distinction.