Carol Middledorf KELLY, Petitioner,

v.

DISTRICT OF COLUMBIA DEPART-MENT OF EMPLOYMENT SER-VICES, Respondent,

and

Washington Hospital Center, Intervenor.

No. 11–AA–1417.

District of Columbia Court of Appeals.

Argued Jan. 31, 2013.

Decided Sept. 26, 2013.

---

Richard W. Galiher, Jr., Chevy Chase MD, for petitioner.

Irvin B. Nathan, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, filed a statement in lieu of brief in support of respondent.

William S. Sands, Jr., with whom, John C. Duncan, III, Fairfax, VA, was on the brief, for intervenor.

Before THOMPSON and BECKWITH, Associate Judges, and BELSON, Senior Judge.

THOMPSON, Associate Judge:

Under the District of Columbia Workers' Compensation Act (the "Act"), an injured worker determined to be eligible for permanent total disability benefits is entitled to a payment set at 66 2/3% of her average weekly wage ("AWW").[1] "[T]he AWW 'is intended to provide a fair and reasonable estimate of what the employee in question would have been able to earn in the labor market in the absence of a work-injury[.]' " *UPS v. District of Columbia Dep't of Emp't Servs.*, 834 A.2d 868, 872 (D.C.2003).

 The instant matter represents the continuation of a dispute between petitioner Carol Middledorf Kelly and her former employer, Washington Hospital Center ("the Hospital"), about the AWW to be used in calculating her workers' compensation permanent total disability payments. We first considered this dispute in *Washington Hosp. Ctr. v. District of Columbia Dep't of Emp't Servs.*, 983 A.2d 961 (D.C. 2009) (*"Middledorf Kelly I"*). As we noted in that opinion, at the time petitioner was injured while working for the Hospital, the Act required generally that an injured worker's AWW be calculated "by dividing by 13 the total wages the employee earned in the employ of the employer in the 13 consecutive calendar weeks immediately preceding the injury[.]"[2] *Id.* at 968 (quoting D.C.Code § 36–311(a)(4) (Supp. 1993) (current version at D.C.Code § 32–1511(a)(4) (2012 Repl.))). However, in cases prior to *Middledorf Kelly I*, our court had recognized that it sometimes is appropriate to calculate a worker's AWW based on fewer than thirteen weeks in order to "produce an honest approximation of claimant's probable future earning capacity." *UPS*, 834 A.2d at 872 (internal quotation marks omitted); *see also George Hyman Constr. Co. v. District of Columbia Dep't of Emp't Servs.*, 497 A.2d 103, 108 (D.C.1985). We concluded in *Middledorf Kelly I* that in petitioner's case, the statutory purpose was not served by including in the AWW calculation two weeks when petitioner did not work and was not paid. *See* 983 A.2d at 969. We remanded the matter to the Compensation Review Board ("CRB") "with instructions to further remand to the [District of Columbia Department of Employment Services ("DOES") administrative law judge

---

1. *See* D.C.Code § 32–1508(1) (2001).

2. The statute was later amended to provide that "[i]f at the time of injury wages are fixed by the day, hour, or by the output of the employee, the average weekly wage shall be computed by dividing by 26 the total wages the employee earned in the employ of the employer in the 26 consecutive calendar weeks immediately preceding the injury." D.C.Code § 32–1511(a)(4) (2001).

("ALJ") ] for a proper calculation" of petitioner's AWW. *Id.* at 969–70.

Eventually, after two remands to the ALJ, the CRB issued an October 4, 2011, Decision and Order, in which it upheld an ALJ determination of petitioner's AWW that was calculated based on 11 of petitioner's last 13 weeks of employment by the Hospital (the "11–week calculation"), reflecting exclusion of the two weeks when petitioner did not work and was not paid. The 11 weeks the ALJ used in the calculation included, however, two other weeks ("the two accrued leave weeks") when petitioner also did not work, but for each of which the Hospital paid her $80.20 based on her then-current balance (5.54 hours) of accrued leave ("the accrued leave payments").[3] Petitioner now seeks review of the CRB decision upholding that aspect of the AWW calculation, contending that the two accrued leave weeks and payments must be excluded from the AWW calculation in order not to "unfairly dilute[ ]" her earning record.[4]

We heard oral argument in this matter on January 31, 2013. Afterwards, we issued a February 5, 2013, Order in which we posed several questions asking the CRB to clarify the basis of its decision upholding the ALJ's 11–week calculation.

The CRB responded in a March 19, 2013, Decision on Record Remand. We have received supplemental briefing from the parties in reaction to the CRB's response, and the matter is now ripe for decision. For the reasons that follow, we affirm in part and reverse in part the CRB's decision, and remand.

## I.

We begin by describing in somewhat more detail the ALJ and CRB rulings issued after the remand in *Middledorf Kelly I*. In an initial decision following our remand, the ALJ determined that five of petitioner's last 13 weeks of work at the Hospital were "zero-pay" "illness-related" weeks and that, therefore, only eight of the thirteen weeks that preceded her workplace injury should be used in the AWW calculation. The ALJ thus used an eight-week calculation that yielded an AWW of $644.57. After the Hospital sought review by the CRB, the CRB determined that the ALJ had erred in "go[ing] beyond the DCCA's reasoning" in *Middledorf Kelly I* by excluding from the AWW calculation more than the two weeks discussed in that opinion. The CRB reasoned that the ALJ improperly "excluded weeks in which the claimant was paid, albeit while on sick

3. The accrued leave weeks were the week ending September 25, 1993, and the week ending October 9, 1993.

 Petitioner asserts that nothing in the record supports the ALJ's conclusion that the $80.20 payments were accrued leave payments, but, we are satisfied, that was a reasonable inference from the record evidence showing petitioner's bi-weekly accruals of 5.54 hours, and 34.46 (i.e., the standard 40 hours less 5.54 hours) "unpaid hours" for weeks when petitioner did not work.

4. The ALJ's compensation order upheld by the CRB established an AWW of $483.37, an amount that reflects the ALJ's inclusion in the calculation of a week (the week ending October 2, 1993, which we shall call the "fifth

week") when petitioner did not work but for which the Hospital paid her $155.22. The particular basis for the $155.22 payment is not explained in the record, but the parties have stipulated that it represents a payment of "wages" within the meaning of the Act. Although petitioner initially challenged inclusion of the fifth week in the AWW calculation, the parties confirmed at oral argument and in supplemental briefing their agreement that the fifth week was properly included in the calculation and that the $155.22 payment should also have been included. With that adjustment, the 11–week calculation produces an AWW of $497.46.

Petitioner contends that her proper AWW, using a nine-week calculation, is $590.19.

leave." The CRB stated that it took "the position that being paid for leave time is still being paid wages for [the] purpose [of] this calculation." It further stated that "excluding [four] weeks [5] would result in an inappropriately inflated (and thereby unreasonable) AWW because wage-earning weeks have been improperly excluded." Finally, the CRB reasoned that "[t]he DCCA determined that . . . only two weeks should have been excluded from the 13 week calculation period" and that the ALJ was "constrained to adopt that reasoning and calculate the new AWW accordingly." The CRB remanded the case again, and the ALJ re-calculated petitioner's AWW using 11 weeks, the determination the CRB upheld in its October 4, 2011, order that is now in issue.

In considering the CRB's ruling and the parties' arguments right after oral argument, this division arrived at a tentative disagreement with the CRB's understanding that our court's decision in *Middledorf Kelly I* tied the ALJ's hands in the way the CRB described. The *Middledorf Kelly I* division remanded the case to the CRB "with instructions to further remand to the ALJ for a proper calculation of claimant's average weekly wage," 983 A.2d at 969–70, without stating that the "proper calculation" must exclude only the two weeks discussed in the opinion. Therefore, in this division's February 5, 2013, order, we instructed the CRB to revisit the question of whether the two accrued leave payments and weeks were to be included in calculation of petitioner's AWW (and, in making that determination, to consider what bearing, if any, petitioner's attendance and earnings history prior to the 13 pre-injury weeks should have on a fair and reasonable estimate of her probable future earning capacity in the absence of her

work injury). We also directed the CRB to explain why its determination is consistent with the statutory purpose to produce a fair and reasonable estimate of petitioner's probable future earning capacity and with the Act more generally.

In its March 19, 2013, Decision on Record Remand, the CRB responded as follows:

> [Petitioner] regularly was absent and took leave during the course of her employment for which she received pay from her accrued leave. These weeks of paid leave represent a salary replacement benefit the [petitioner] utilized on a regular basis. As such, considering [petitioner's] work history, the two [accrued leave payments and weeks] should be included in the AWW determination. This is consistent with the statutory definition of wages which includes "the reasonable value of board, rent, housing, lodging, or similar advantage received from the employer, and gratuities received in the course of employment from other than the employer[,]" [citing D.C.Code § 32–1501(19) ].
>
> Inclusion of the [accrued leave] payments in the [AWW] determination further comports with the purpose of the Act to arrive at an equitable result in the case at bar. To include these two weeks best represents [petitioner's] AWW prior to the work injury and is the best proxy for the [petitioner's] loss of wage-earning capacity.
>
> . . . .
>
> [W]hen considering the [petitioner's] attendance and earnings history, it is important to consider that she consistently took days off from work and used accrued leave. At times [she] would also take unpaid leave. Thus, in order to

produce a fair and rational estimate of [her] AWW, inclusion of the weeks she received leave benefits should be included into the calculation of AWW.

The [petitioner], a full time employee, had a history of not working full·time hours although such a schedule was available to her. [Her] choice to consistently use either accrued leave or unpaid leave is important in reaching a fair and reasonable result of her AWW. Inclusion of the two [accrued leave payments and weeks] ... produces a fair estimate of [her AWW].

. . . .

[I]nclusion of the two weeks where [petitioner] was paid for leave benefits results in a fair and reasonable estimate of her future earning capacity. To exclude the two weeks would artificially inflate the AWW.

While the statute references the "humanitarian purposes of the Act," ... such humanitarian purposes are not furthered. when an injured worker is unjustly enriched by a higher AWW based on the timing of an unforeseen injury.... Including these two weeks of paid leave is not intended to punish [petitioner]. Rather, including these two weeks best reflects a fair and accurate AWW and is in line with the statutory purposes of the Act.

Petitioner challenges the CRB's October 4, 2011, Decision and Order and its March 19, 2013, Decision on Record Remand in several respects. First, she contends that the CRB too narrowly interpreted this court's mandate-on-remand in *Middledorf Kelly I*. She further contends the rationale of *Middledorf Kelly I* (i.e., that weeks when a worker was unavoidably absent from work due to illness should be omitted from the AWW calculation) requires exclusion of the two accrued leave weeks, and that the CRB erred both in ignoring the ALJ's finding that the two accrued leave

weeks were "illness-related" and in upholding the ALJ's use of a calculation that included those weeks. Petitioner also contends that the $80.20 accrued leave payments for those weeks were not, as the CRB declared, "wages" within the meaning of the Act and therefore that the accrued leave payments should not have been included in the AWW calculation. In addition, petitioner argues that the CRB's reference to her "choice" to use leave is not supported by substantial evidence in the record. She asserts that the record "undisputedly shows" that it was her need, not her choice to use leave. Finally, she contends that including the accrued leave weeks and payments in the AWW calculation does not result in a fair estimate of what her future earning capacity would have been absent the workplace injury. We consider these arguments in the analysis that follows.

## II.

▬ "Our now-familiar standard of review of agency decisions in workers' compensation cases is governed by the District's Administrative Procedure Act[,] D.C.Code §§ 2–501, –510, *et seq.* (2001)." *UPS*, 834 A.2d at 871. "We must determine first, whether the [agency's] findings are supported by substantial evidence on the record as a whole; and second, whether [its] conclusions flow rationally from those findings and comport with the applicable law." *Id.* Our review of the agency's legal conclusions is *de novo*, because "[i]t is emphatically the province and the duty of the judicial department to say what the law is." *Id.* (internal quotation marks omitted). At the same time, "we accord great weight to any reasonable construction of a regulatory statute by the agency charged with its administration .... [and] will defer to an agency's interpretation of a statute that it administers so long as it is not plainly wrong or inconsistent with the

legislature's intent." *Id.* (internal quotation marks and brackets omitted). "[T]he deference that courts owe in such cases is at its zenith where the agency's administrative construction has been consistent and of long standing." *Id.* (internal quotation marks and brackets omitted).

### III.

 We begin our analysis with petitioner's contention that the CRB incorrectly interpreted this court's mandate in *Middledorf Kelly I.* Only a brief discussion is necessary. We agree with petitioner that "'upon a new appeal, it is for this court to construe its own mandate, and to act accordingly.'" *Ex parte Mansfield,* 11 App. D.C. 558, 562 (D.C.1897). From our reading of the opinion in *Middledorf Kelly I,* we see nothing to indicate that the panel considered or meant to resolve whether there were, in addition to the two weeks on which the opinion focused (weeks when petitioner "did not work . . . and was not paid," 983 A.2d at 969), other weeks (weeks "in which claimant's absence from work was unavoidable due to illness," *id.*) falling within petitioner's 13–weeks of pre-injury employment that should be excluded from the AWW calculation. The opinion did not fully address the claim, presented in petitioner's briefs in *Middledorf Kelly I,* that the AWW calculation should not have included "a 4 week period when Middledorf was sick."

The rationale of *Middledorf Kelly I* was adherence to our reasoning in *UPS,* that some pre-injury weeks must be excluded from the AWW calculation to "'produce an honest approximation of claimant's probable future earning capacity.'" 834 A.2d at 872 (quoting 5 Arthur Larson, Larson's Workers' Compensation Law (hereafter, "Larson") § 93.01[1][e], at 93–11 (2003) (current version at § 93.01[1][e], at 93–10 (2013))). In light of that rationale, we discern no reason why the *Middledorf Kelly I* panel would have intended to preclude the ALJ from excluding from the AWW calculation other weeks if the record established that petitioner was unavoidably absent from work due to illness and if inclusion of those weeks would lead to an unfair estimate of her earning capacity. We therefore conclude that while this court's mandate required exclusion of the weeks when petitioner did not work and received no pay at all, it did not require exclusion of *only* those weeks.

### IV.

 We next address petitioner's contentions that the $80.20 accrued leave payments for the two accrued leave weeks were not "wages" within the meaning of the Act and that the CRB erred in concluding to the contrary and in directing the ALJ to include the accrued leave payments in the AWW calculation. As the CRB noted, the Act defines "wages" to mean "the money rate at which the service rendered is recompensed under the contract of hiring in force at the time of the injury, including the reasonable value of board, rent, housing, lodging, or similar advantage received from the employer, and gratuities received in the course of employment from other than the employer." D.C.Code § 32–1501(19) (2001). It appears that neither this court nor the CRB has previously addressed whether payments of accrued leave constitute wages. However, our research indicates that the interpretation of the DOES Director (who had appellate-review responsibility with respect to workers' compensation orders prior to creation of the CRB)[6] was that "sick leave payments actually received during an employee's periods of disability are included as wages under the Act, for purposes of computing the average weekly wage." *In re Bridgeman,* 1994 DC Wrk.

---

6. *See Darden v. District of Columbia Dep't of Emp't Servs.,* 911 A.2d 410, 414 (D.C.2006).

Comp. LEXIS 198, at *29 (Feb. 2, 1994) (hearing examiner decision summarizing the holding of *Terry Rychlik v. WMATA*, H & AS No. 84–192, OWC No. 000340 (Director's Decision, Nov. 26, 1986)). Similarly, the DOES Director's interpretation was that the AWW calculation "can include the reasonable value of vacation pay earned during the thirteen (13) weeks immediately preceding an employee's work injury." *Id.* at *29–30 (summarizing the holding of *Cherry v. Gladieux Corp.*, H & AS No. 83–108, OWC No. 0013811 (Director's Decision, Feb. 3, 1984)). In light of those interpretations by the CRB's predecessor, the deference we accord to " 'consistent and of long standing' " administrative agency interpretations, *UPS*, 834 A.2d at 871, weighs in favor of affirming the CRB's interpretation in this case, i.e., that the accrued leave payments were, in the language of the Act, D.C.Code § 32–1501(19), a "similar advantage received from the employer," and thus constituted wage payments. Moreover, we agree with the Hospital that "[p]aid leave is a form of recompense for service to the employer," and that there is no apparent reason for treating accrued leave payments as something other than "wages" for purposes of calculating AWW.

Finally, we note that the AWW calculation upheld by the CRB included accrued leave payments petitioner received for weeks when she worked a portion of the week but not a full 40–hour week—i.e., weeks for which she received her hourly-rate salary for hours worked, *plus* accrued leave payments. Neither party contends that those leave payments should have been excluded from the AWW calculation, and we are not persuaded that it would be appropriate to treat payments of accrued leave as "wages" for such partial weeks, but to treat them as something other than "wages" paid for the two accrued leave weeks. For all the foregoing reasons, we uphold the CRB's ruling that the two accrued leave payments were "wages" for purposes of the AWW calculation.

## V.

Petitioner contends that the ALJ, in the first compensation order it issued following this court's remand, "found substantial evidence to conclude that [petitioner] was sick" during the two accrued leave weeks and that the CRB therefore erred in requiring that these "illness-related" weeks be included in the AWW calculation. She argues that the CRB improperly went beyond its circumscribed role, which is " 'limited to a review of the decision of [the ALJ] to determine whether the [ALJ's] findings are supported by substantial evidence in the record' " and to determine whether the ALJ's legal conclusions are in accordance with law. *Washington Metro. Area Transit Auth. v. District of Columbia Dep't of Emp't Servs.*, 992 A.2d 1276, 1280 (D.C.2010).

∎ The CRB did not specifically discuss the ALJ's finding that there were four weeks (including the two weeks discussed in *Middledorf Kelly I* and the two accrued leave weeks) that were "clearly illness related." However, while this court "review[s] the decision of the [CRB]," we "cannot ignore the compensation order which is the subject of the [CRB's] review." *Id.* at 1280 (internal quotation marks omitted). Our review of the ALJ's ruling and the record, including the record in *Middledorf Kelly I*, leads us to agree with the Hospital that the ALJ's finding that there were, among the 13 pre-injury weeks, four "clearly illness related" weeks—including both of the two accrued leave weeks—was not supported by substantial evidence.[7]

---

**7.** "Substantial evidence is more than a mere scintilla; it is evidence that a reasonable mind might accept as adequate to support a

To explain why, we begin by noting that, as shown on Hospital timesheets and the wage schedule prepared by the Hospital's payroll manager, the five pre-injury weeks when petitioner did not work covered the period from the week ending September 18, 1993, through the week ending October 16, 1993. Regarding those five weeks, the record reveals (and, in some cases, *Middledorf Kelly I* dictates) the following:

- As to the week ending *September 18, 1993*, the record does not show any type of payment to petitioner for that week. Thus, it was a week when petitioner "did not work ... and was not paid," one of the weeks *Middledorf Kelly I* dictates is to be excluded from the AWW calculation.

- According to Petitioner's Supplemental Brief, the week ending *October 2, 1993*, was the week we have dubbed the "fifth" week: the "no work" week for which petitioner was paid $155.22 and which the parties have now stipulated should be included in the AWW calculation.

- The record shows that the week ending *October 9, 1993*, was a week when petitioner was sick with a stomach malady. At the March 2002 (pre-*Middledorf Kelly I*) hearing before a DOES ALJ, petitioner testified that her "stomach [problem] was in October," and specifically that it was during the period from October 4, 1993, through October 18, 1993,[8] (which includes the week ending October 9, 1993) that she was "out of work be-

cause of [her] stomach" and for which "the doctor gave [her] the doctor's note." Notably, the week ending October 9, 1993, was one of the two accrued leave weeks for which petitioner was paid $80.20 for 5.54 hours of accrued leave. We are therefore satisfied that substantial evidence supported the ALJ's finding and conclusion (on first remand) that *one* of the two accrued leave weeks (the week ending October 9, 1993) was an illness-related week that should be excluded from the AWW calculation under the rationale of *Middledorf Kelly I*.[9]

- Petitioner's testimony about her October 1993 stomach illness also accounts for the week ending *October 16, 1993*. Thus, it, too, was an illness-related week that should be excluded from the AWW calculation under the rationale of *Middledorf Kelly I*.

- That brings us to the remaining week: the week ending *September 25, 1993*, which the record shows is the other accrued leave week in issue in this case. This was not a "was not paid" week, and we see nothing in the record that substantiates that petitioner was ill during this week. Petitioner did not testify that she was ill during this week,[10] and the record contains no doctor's note or medical documentation about it. In discussing the weeks that he initially excluded from the AWW calculation, the ALJ accepted, as evidence that petitioner was ill, the Hospital's notation of an "S" (for

---

conclusion." *Pierce v. District of Columbia Police & Firefighters' Ret. & Relief Bd.*, 882 A.2d 199, 205 (D.C.2005) (internal quotation marks omitted).

8. The period when petitioner was "out of work because of [her] stomach" was *not*, as the ALJ erroneously observed, "a three week period."

9. *See Middledorf Kelly I*, 983 A.2d at 969 ("[T]hose two weeks ought not to have been included in calculating her average weekly wage .... [because the] absence from work was unavoidable due to illness[.]").

10. Regarding September 1993, petitioner testified only that she missed a day of work around September 7, 1993, when her husband had surgery.

"sick") on its weekly timesheets. While the ALJ reasonably observed that the Hospital's payroll manager "understands the record keeping and payroll systems better than" the ALJ himself did, we see no reason to think that the Hospital timekeeper's entries were based on personal knowledge about the reasons for employees' absences. In light of petitioner's specific testimony that she was ill in October 1993 and her doctor's note to that effect, and the conspicuous absence of any similar evidence about the week ending September 25, 1993, we conclude that the record does not support the ALJ's conclusion that this second accrued leave week was an illness-related week.[11]

■ Petitioner may well have been ill during the week ending September 25, 1993 (the record suggests that she had a number of ongoing medical problems), but she bore the burden of proving that claim.[12] *See George Hyman Constr.*, 497 A.2d at 108 (approving as reasonable DOES Director's ruling that if claimant "wished to establish [a greater] average weekly wage . . ., he had the burden to submit evidence" supporting it).[13] This was especially the case since petitioner sought to "alter" the parties' previously stipulated AWW.[14] *See Cather v. District of Columbia Dep't of Emp't Servs.*, 808 A.2d 766, 769–70 (D.C.2002) (upholding

DOES Director's decision placing the burden on a claimant to establish entitlement to modification of a compensation order). Because petitioner did not meet that burden, we conclude that only one of the two accrued leave weeks (the week ending October 9, 1993) was excludable from the AWW calculation as a week when she was ill.

## VI.

■ That does not end our analysis because, as our opinion in *UPS* establishes, absence from work because of illness is not the only reason that can justify exclusion of a pre-injury time period from the AWW calculation. *See UPS*, 834 A.2d at 870 ("[T]he two weeks that Claimant was on strike should not have been included in the calculation of his average weekly wage."). AWW "is to be so calculated as 'to produce an honest approximation of claimant's probable future earning capacity,'" *Id.* at 872 (quoting Larson, § 93.01[1][e], at 93–11 (current version at § 93.01[1][e], at 93–10 (2013)), and so as not to "distort[ ] the claimant's future earning capacity." *Id.* at 873. We must therefore consider petitioner's argument that to include in the AWW calculation a week when she did not work, but was paid based on 5.54 hours of accrued leave, understated her earning capacity.

For the following reason, we are not persuaded by petitioner's argument. The

---

**11.** We say this while recognizing that the hearing in 2002 came almost nine years after the time period in issue, making it understandable that some records might not have been available. Petitioner was nonetheless able to produce her doctor's note for the October 4 to October 18, 1993, period.

**12.** We note that the matter of whether petitioner was ill whenever she was absent from work was not uncontroverted. The Hospital asserts that petitioner was paid some sick leave for all but two of the eight weeks the ALJ initially used to determine the AWW, and

that a "limited amount of the time missed was due to sickness."

**13.** *See also Belton v. Traynor*, 381 F.2d 82, 87 (4th Cir.1967) ("[T]he burden of proving average weekly wage remains on the claimant."); *Smith v. QHG of Dothan, Inc.*, 872 So.2d 197, 205 (Ala.Civ.App.2003) ("The burden of proving . . . average weekly wages for purposes of computing benefits under the Workers' Compensation Act is the employee's.").

**14.** *Middledorf Kelly I*, 983 A.2d at 967.

record reflects that there were circumstances during 1993 that may have overstated petitioner's future earning capacity. Petitioner, who worked for the Hospital as a nuclear medicine technician, testified that during a portion of 1993, including August 1993, she worked "outside of [her] regular hours" assisting one of the physicians at the Hospital who was doing research on ovarian and colon cancer. During that period, she testified, there was a time when she had to come to work five hours early to "get the cameras ready" and to perform patient scans, work for which she earned a "big increase in money." That "big increase" appears to be reflected in the payroll manager's wage schedule, which shows that petitioner typically was paid in the neighborhood of $500 to $600 per full work week, and also shows that for the weeks ending August 14 and 21, 1993 (two of the 13 pre-injury weeks), she was paid $793.45 and $1,324.32, respectively. Because petitioner's pay for those weeks, which at least arguably was anomalous rather than representative of petitioner's future earning capacity, offset the impact of including the September 25, 1993, accrued leave week (and the $80.20 petitioner was paid for that week) in the AWW calculation, we are not persuaded that in-

clusion of the September 25, 1993, accrued leave week had the distorting effect petitioner claims. As petitioner herself acknowledges, "the regularity of claimant's earnings during the pre-injury statutory period is to be considered in determining the claimant's loss of future wage earning capacity." Petitioner's Supplemental Brief at 7.[15]

■■■ At the same time, we cannot accept the CRB's reasoning that exclusion of the accrued leave week when petitioner was sick and the $80.20 payment for that week—a result we have determined is required—"would "artificially inflate" petitioner's AWW. The CRB reasoned that calculating the AWW by including the accrued leave weeks is appropriate to produce an "equitable result" that reflects that petitioner "regularly was absent and took leave during the course of her employment." The Hospital similarly emphasizes that petitioner "regularly missed work due to illness both in and outside of the 13–week period" and asserts that exclusion of both accrued leave weeks from the AWW calculation "would result in a situation akin to paying disability benefits to a part-time employee on the basis of full time pay."[16] (We assume the Hospital

15. *Cf. Bradley v. Vic's Welding,* 405 N.W.2d 243, 245–46 (Minn.1987) (upholding determination that claimant's overtime payments were not to be included in determining his weekly wage because overtime "was not regular or frequent throughout the year in employer's business," and noting that "there are various circumstances which make the claimant's actual earnings during a particular period an unreliable measure of his future earning power" and that "sometimes it is as important to reject as it is to accept a brief recent-wage experience, if a realistic approximation of future wage loss is to be obtained") (quoting Larson, § 60.21(c) (1987) (current version at §§ 93.02[1] and 93.02[2][c] (2013))); *Carroll v. Wells Fargo Armored Serv. Corp.,* 240 Mont. 151, 783 P.2d 387, 391 (1989) (observing that generally, for

purposes of determining a claimant's pre-injury wages, "overtime earnings are not included.... However, if the work record shows that ... the claimant actually worked overtime on a consistent, regular basis ... then that overtime becomes part of the usual hours of employment.") (citation and internal quotation marks omitted).

16. The Hospital highlights the record evidence that petitioner worked a total of 265.61 hours in the thirteen weeks that preceded her workplace injury (an average of 20.43 hours per week) and took a total of 54.78 hours of paid sick leave; that during the eight (of 13 pre-injury) weeks when she came to work, she worked an average of 33.20 hours; that during 1993, she worked an average of 25.09 hours per week over the 44 weeks before her

would say the same about exclusion of just one of the accrued leave weeks.)

We understand the CRB's reasoning and the Hospital's argument. Both appear to reflect an effort to apply the principle that where an employee's "relation to the labor market is ... deliberately part-time," Larson, § 93.02[2][c] (2013), it may be inappropriate to determine wages as if the employee has consistently worked full-time. As Professor Larson explains:

> [T]he purpose of the wage calculation is not to arrive at some theoretical concept of loss of earning capacity; rather it is to make a realistic judgment on what the claimant's future loss is in the light of all the factors that are known. One of these factors is the established fact of claimant's choice of a part-time relation to the labor market. If this is clear, *and above all if there is no reason to suppose it will change in the future period into which the disability extends,* then it is unrealistic to turn a part-time able-bodied worker into a full-time disabled worker.

Larson, § 93.02[2][c] (2013) (emphasis in the original).

Under the foregoing rationale, if the record showed that petitioner had effectively chosen to work part-time and thus could have been expected to continue to do so absent the workplace injury, the most equitable approach might be to include in the AWW calculation all of her no-pay and low-pay weeks falling within the 13–week pre-injury period. We conclude, however, that the record supports petitioner's assertion that she did not make what the CRB called a "choice" to use accrued leave and a "choice" not to work full-time hours, but instead frequently needed to use leave or to curtail her hours because of health problems. Although her health problems mentioned in the record were numerous, we see nothing in the record to suggest that any of them portended that petitioner's future earning capacity, had she not sustained the workplace injury, would have been based on something less than full-time work.[17]

## VII.

For the foregoing reasons, we remand this case to the CRB again, instructing it to further remand again to the ALJ for a recalculation of petitioner's AWW. It appears that under the analysis above (which requires inclusion in the calculation of one of the accrued leave weeks with corresponding payment, and exclusion of the other accrued leave week and corresponding payment), the ALJ will arrive at a middle ground figure: not $497.46 (the

---

November 2, 1993, injury; that she took 214.82 hours of sick leave during the same 44–week period and missed "substantial additional time" from work without paid leave; that she "took sick pay in 20 out of 44 weeks prior to the work accident"; that in 10 of the 44 weeks, she worked zero hours, and had no earnings in seven of the 44 pre-injury weeks; that 18 of the 44 weeks were weeks during which she came to work at least one day but worked a total of fewer than nine hours; that she missed the equivalent of four out of five days in the first 44 weeks of 1993; and that there were 15 weeks when she worked fewer than 20 hours.

**17.** The record reflects that during February 1993, petitioner was recovering from thyroid cancer surgery, and that she had endocrinological problems that caused absences from work in March 1993, sustained an injury to her hand in June 1993, and suffered from irritable bowel syndrome, a hiatal hernia, an ulcer, and stomach problems in October 1993. Nothing in the record indicates that these were permanent conditions. Petitioner testified about her hiatal hernia coming "back" after she began taking pain medication as a result of her workplace injury, implying that it had healed and gone away by November 1993. Her hand injury caused her to miss "a couple of days" or a "couple of weeks" from work.

amount the Hospital advocates, which reflects inclusion of the two accrued leave weeks and payments); not $590.19 (the amount petitioner advocates, which reflects exclusion of both accrued leave weeks and payments); but an amount somewhere in between the two. We leave the precise calculations to the ALJ.

The CRB's decision is affirmed in part and reversed in part, and the matter is remanded for a proper calculation of petitioner's AWW.

*So ordered.*

