Margaret YOUNG, petitioner,

v.

DISTRICT OF COLUMBIA DEPART-
MENT OF EMPLOYMENT SER-
VICES, Respondent,

and

Washington Hospital Center and
Kemper Insurance Company,
Intervenors.

No. 05–AA–992.

District of Columbia Court of Appeals.

Argued Dec. 8, 2006.

Decided March 15, 2007.

Mark L. Schaffer, Washington, for petitioner.

Robert J. Spagnoletti, Attorney General for the District of Columbia at the time the statement was filed, Edward E. Schwab, Deputy Attorney General, and William J. Earl, Assistant Attorney General, filed a statement in lieu of brief for respondent.

William S. Hopkins for intervenors.

Before FISHER, BLACKBURNE–RIGSBY and THOMPSON, Associate Judges.

THOMPSON, Associate Judge:

Petitioner Margaret Young challenges a decision of the Department of Employment Services ("DOES") Compensation Review Board ("the Board") that upheld a Compensation Order denying her claim for temporary total disability benefits and related medical expenses. DOES found that petitioner had not established that, during the period in issue, she had a disability that was causally related to exposure to mold at her place of employment, as she claimed. Because we find that DOES failed to consider possible "alternative work-related causes" of the adverse symptoms that underlie petitioner's disability claim, and also made no finding as to whether petitioner was able to return to her work during the period in issue, we reverse and remand.

### Background

Administrative Law Judge ("ALJ") Linda Jory found the following in her December 27, 2004 Compensation Order. Petitioner Young is a registered nurse who worked as a charge nurse in the labor and delivery unit at Washington Hospital Center ("the Hospital"). In May 2002, con-

tractors began a flood remediation project throughout parts of the Hospital. On the morning of July 6, 2002, project work was ongoing in a sealed-off area near the nurses' station where petitioner was working. At some point during the morning, the area near the nurses' station "began to get dusty and a large cloud-like burst of powder emitted into the nurses station area." Petitioner was exposed to "a cloud of fine particulate matter" that was "thick enough to affect visibility." By lunchtime, petitioner had developed a headache and cough. She notified her supervisors, who sent her to the emergency room, where doctors placed her on oxygen and gave her medication and nebulizers. Thereafter she sought treatment from her personal physician, Dr. Robert Davison, who referred her to a pulmonary specialist, Dr. Norton Elson. Petitioner told her personal physician and other physicians who examined her that the dust she had been exposed to at work was from a mold abatement project at the Hospital.

After staying off work for nearly a month, petitioner returned to work on August 3 at Dr. Elson's recommendation. After approximately ninety minutes on the job, she noticed a burning in her nose, tightness in her chest, fever-like warmth, coughing, a sore throat and voice changes. She again went to the emergency room and was sent home. When she saw Dr. Elson on August 28, he recommended that petitioner "avoid her offending work environment."

On March 21, 2003, Dr. Elson opined that petitioner had significant control of her symptoms, and advised that she could return to work if she avoided her previous work setting. Petitioner began working with a vocational rehabilitation counselor engaged by the Hospital. Because petitioner was home-schooling her children, it was difficult for her to schedule time for vocational services and interviews. Eventually she found work on her own as a registered nurse. She began work again at a different hospital on February 12, 2004.

The Hospital voluntarily paid petitioner's disability benefits from July 7, 2002, through March 12, 2003. She sought, in addition, an award of temporary total disability benefits for the period from March 14, 2003, through February 11, 2004, and payment of her medical expenses.

An ALJ conducted an evidentiary hearing on September 25, 2003, on the issues of whether petitioner's disability, if any, for that period was "causally related to an injury which arose out of and in the course of her employment on July 6, 2002;" the nature and extent of her disability, if any; and whether she had voluntarily limited her income.[1] In the resultant December 27, 2004 Compensation Order, ALJ Jory noted that the District of Columbia Workers' Compensation Act of 1979, D.C.Code § 32–1501, et seq., affords petitioner a presumption of a medical causal relationship between her claimed disability and a work-related event that had the potential of resulting in the disability.[2] Under that

---

1. The ALJ who conducted the hearing resigned her position with the Office of Hearings and Adjudication before the parties submitted their written closing arguments. Upon that resignation, ALJ Jory became responsible for resolving the appeal.

2. See Murray v. District of Columbia Dep't of Employment Servs., 765 A.2d 980, 983 (D.C. 2001). The presumption is "designed to ef-

fectuate the humanitarian purposes of the statute" and "reflects a 'strong legislative policy favoring awards in arguable cases.'" Ferreira v. District of Columbia Dep't of Employment Servs., 531 A.2d 651, 655 (D.C.1987) (quoting Wheatley v. Adler, 132 U.S.App. D.C. 177, 183, 407 F.2d 307, 313 (1968) (en banc)). The presumption is "to be construed liberally for the benefit of employees and their depen-

presumption, the Hospital had the burden of establishing, by "specific and comprehensive" evidence, that petitioner's disability did not arise out of and in the course of employment.[3]

ALJ Jory found that, through the testimony of independent medical examiner ("IME") Dr. Ross Myerson, the Hospital " 'sharply sever[ed] or rebut[ted]' the presumptive relationship between petitioner's symptoms and her employment." Dr. Myerson saw petitioner on August 19, 2002, and thereafter reviewed her medical records as well as documentation provided by the Hospital about the remediation project. The ALJ specifically cited Dr. Myerson's observation, from petitioner's laboratory test records, that the only fungi as to which petitioner had any significant elevations "were not found when [petitioner's] work area was tested." The ALJ also cited Dr. Myerson's conclusion that "[t]here is no credible medical or scientific data which would link [petitioner's] multisystem complaints to the July 6, 2002 exposure to dust at the Washington Hospital Center." The ALJ reasoned that Dr. Myerson's report was "overwhelmingly specific and comprehensive," causing the presumption of causality to fall out of the case, and requiring petitioner to prove that her alleged disability was causally related to the July 6, 2002 incident.

The ALJ found that petitioner did not meet that burden even though she presented evaluations by several physicians to support her claim. The ALJ found that the physicians' opinions (other than Dr. Myerson's) were "unreliable" because they were based on the "exaggerated and incorrect history that claimant's work station

was literally blanketed with mold" and that "mold was sprayed out into the area where she worked." The ALJ concluded that IME Dr. Myerson was the "only physician of record who had an understanding of the irritants [petitioner] was exposed to at her workplace." The ALJ also relied on the testimony of John Morosko, a supervisor for the Hospital's flood damage repair contractor. Morosko, who was on the job when the dust cloud was expelled on July 6, 2002, testified that workmen had been removing fireproofing material composed of processed paper (cellulose) and Styrofoam, that the "material had been tested for asbestos and mold or bacteria growth," and that "the area contained [behind polyethylene sheeting near petitioner's nurses' station] in July 2002 did not contained [sic] any mold growth." Finally, the ALJ cited the testimony of John Kerner, a certified industrial hygienist/aerosol scientist, who testified that in October 2001, his company had taken bulk samples of the material to be removed from the area near the nurses' station where petitioner was working, and that no mold was found at that time. He also testified that there was no water source that could have supported mold growth in that area and that the mold level was not a dangerous or health factor.

Although acknowledging the evidence that petitioner possessed antibodies to myelin and to several different toxigenic molds and other toxins, the ALJ found "no persuasive evidence that the work performed at claimant's work area caused any increased level of mold which could be causally linked to her ongoing disability." The ALJ also found that petitioner had not proffered any credible testimony to coun-

dents." *J.V. Vozzolo, Inc. v. Britton,* 126 U.S.App. D.C. 259, 262, 377 F.2d 144, 147 (1967). "[D]oubts as to whether [an] injury arose out of the employment are resolved in the claimant's favor." *Baker v. District of*

*Columbia Dep't of Employment Servs.,* 611 A.2d 548, 550 (D.C.1992).

3. *Ferreira,* 531 A.2d at 655 (internal citation and quotation omitted).

ter the testimony of the Hospital's contractor "that the material they were removing was fireproofing material which was ... cellulose material or a paper like substance." The ALJ held that without the benefit of the statutory presumption, petitioner had not established that her alleged disability and wage loss were causally related to the exposure she experienced on July 6, 2002.

In an August 31, 2005 ruling, the Board found that the Compensation Order was supported by substantial evidence and therefore concluded that there was no reason to disturb the ALJ's findings even if the Board itself might have reached a different conclusion.[4] The Board accordingly affirmed the Compensation Order, and this appeal followed.

### Analysis

The ALJ's analysis had two focal points. First, the ALJ focused on petitioner's report that she had been exposed to mold, her medical test results showing that she had antibodies to toxigenic molds and fungi, and the Hospital's evidence that no such offending molds or fungi were found when bulk sample materials from the worksite area were tested in October 2001. As noted *supra*, from the Hospital's evidence, the ALJ concluded that the statutory presumption was overcome and that petitioner had failed to show that her disability was causally related to her exposure to particulates on July 6, 2002. Second, the ALJ focused on the IME's conclusion that there is "no credible medical or scientific data which would link [petitioner's] multi-system complaints to [her] July 6, 2002 exposure to dust" at the Hospital.

■ Although there is evidence in the record that might have supported a different conclusion about mold or fungi in the workplace as a cause of petitioner's claimed disability,[5] we agree with the

---

4. The Board has the responsibility to provide administrative review of compensation orders that formerly was vested in the Office of the DOES Director. *See* 52 D.C.Reg. 11092 (2005); *see also* DOES Administrative Policy Issuance No. 05–01 (February 5, 2005) (http://does.dc.gov/do es/lib/does/services/Revised—Admin—Issuance—05–01.pdf). Accordingly, our earlier case law articulating the standard of review of decisions of the DOES Director governs our review of Board decisions: the Board's decision must stand undisturbed unless it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See* D.C.Code § 2–510(a)(3) (2001); *Darden v. District of Columbia Dep't of Employment Servs.*, 911 A.2d 410, 415 (D.C. 2006). We defer to a decision of the Board provided that it flows rationally from facts supported by substantial evidence in the record. *Id.* Our standard of review mirrors that which the Board itself was bound to apply. *Id.* (citing *Canlas v. District of Columbia Dep't of Employment Servs.*, 723 A.2d 1210, 1211 (D.C.1999)). "The Board had authority to reverse the ALJ's order only if it was unsupported by substantial evidence or was legally incorrect." *Darden,* 911 A.2d at 415; *see also Gary v. District of Columbia Dep't of Employment Servs.*, 723 A.2d 1205, 1209 (D.C.1998).

5. Among the countervailing evidence was testimony that testing of the fireproofing material removed from the area near the nurses' station was carried out in October 2001, many months before the workplace incident that petitioner described, and again after the project was completed, but not on or about July 6, 2002; that mold was found in other areas of the Hospital; and that air currents can carry mold spores and move them around. Moreover, our workers' compensation case law relating to workplace allergens dictates against any assumption that, because a substance present in the Hospital may not have been at dangerous or unhealthful levels for the general public, the substance could not cause an adverse reaction in a particular claimant. *See Howard Univ. Hosp. v. District of Columbia Dep't of Employment Servs.*, 881 A.2d 567 (D.C.2005) (latex allergy); *Wash. Post v. District of Columbia Dep't of Employment Servs.*, 853 A.2d 704 (D.C.2004) (allergy to a newspaper printing chemical).

Board that, in light of the standard that governed both its and our review, the ALJ's conclusions on this point may not be disturbed. Stated differently, substantial evidence supports the ALJ's finding that the Hospital's evidence regarding mold and fungi was sufficiently specific to rebut a presumption that mold or fungus exposure at the Hospital caused petitioner's injury.[6] However, discrediting petitioner's claims about mold "hardly proved that [her] disability was not work-related." *Ferreira*, 531 A.2d at 658. Our review of the evidence of record, much of which the ALJ did not discuss, leads us to hold that the Hospital's rebuttal evidence about mold was not "comprehensive enough to sever the potential connection," *Ferreira*, [531 A.2d at 655 (internal quotation to citation omitted)], between the July 6, 2002 workplace incident and petitioner's symptoms. We also conclude that, in focusing on whether exposure to particulates caused *all* of the multi-system symptoms that petitioner continued to complain of during the period in dispute, the ALJ failed to consider whether petitioner had demonstrated a work-related disability involving at least *some* of her adverse symptoms.

Both petitioner and the Hospital's witness Mr. Morosko testified about the cloud of dust containing particulates that was released on July 6, 2002, near the nurses' station where petitioner was working. Petitioner testified about her almost immediate respiratory distress, which she reported to several physicians and which returned each time she went into the Hospital. The ALJ did not discredit any of this testimony. Petitioner testified that she suffered adverse respiratory symp-

toms not only when she tried to return to her work on August 3, 2002, as the ALJ recounted, but also on two other occasions: during a visit to the Hospital's employee health unit and during an appointment with pulmonary specialist Dr. David Gross, whose office was on the Hospital premises.

Further, several physicians rendered consistent diagnoses that petitioner had some type of respiratory condition related to an environmental exposure. Dr. Robert Davison saw petitioner on July 11, 2002, and assessed her as having "chemical bronchitis." On August 28, 2002, Dr. Elson said that petitioner exhibited symptoms of "occupational asthma with recurrent symptoms when exposed to her work environment." He opined that her dust exposure left her with "some residual inflammatory component, manifested by her diminished exercise capacity," and advised her to "avoid[ ] the previous work setting to which she appears to be sensitive." Dr. Gross, who saw petitioner in his capacity as an IME, diagnosed her as having a mild form of reactive airway dysfunction syndrome, which he explained is "a type of asthma that can start with one environmental exposure which can trigger off inflammation which never really goes away." Even IME Dr. Myerson, who doubted a connection between petitioner's "multi-system" symptoms and her dust exposure, diagnosed petitioner in August 2002 as having reactive airway dysfunction syndrome, advised her that if she developed a "recurrent problem[ ] with respiratory tract symptoms including wheezing or coughing, she would be well advised to remove herself from the work place at that time," and noted that "[t]he prognosis with

---

6. "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Dell v. Dep't of* *Employment Servs.*, 499 A.2d 102, 108 (D.C. 1985) (internal citation and quotation omitted).

respect to a successful, asymptomatic return to her previous work is somewhat guarded." Although the ALJ correctly noted that petitioner told doctors that she had been exposed to mold, the doctors' notes reflect questions about whether petitioner was exposed to mold, fungus, chemicals or other allergens, and Dr. Elson explicitly referred to petitioner's exposure to dust of "unknown nature."

In addition, contractor Morosko testified that the particulate material that fell on July 6, 2002, would cause respiratory irritation "if inhaled." Aerosol scientist Kerner testified that the paper and Styrofoam fireproofing materials that were removed near the nurses' station were "not necessarily" hyper-allergenic (meaning, we presume, that sometimes the materials can produce an allergic reaction). Mr. Morosko also described the replacement fireproofing material that the Hospital contractors were installing in work areas throughout the Hospital as "an irritant."

 In light of this evidence, the Hospital's rebuttal evidence focusing on the presence or absence of mold was not sufficiently comprehensive to rebut the presumption that an environmental factor in petitioner's workplace caused her to have respiratory and other problems.[7] Presented with this panoply of evidence, the ALJ had an obligation to consider whether something other than mold or fungi caused petitioner's adverse symptoms, because "confining a claimant to one particular theory of employment causation, or failing to consider other possible employment-related causes of a disability is antithetical to the [workers' compensation] statutory and regulatory scheme."[8] *Ferreira,* 531 A.2d at 659 (internal quotation omitted). The ALJ erred by not considering factors other than mold or fungi as "alternative work-related causes of petitioner's disability...." *Id.* at 657; *see also id.* at 654, 656, 659 (ALJ erred in denying petitioner's claim upon discrediting her testimony about the occurrence of a specific lifting incident that she pointed to as the cause of her neck and shoulder pain; the ALJ was "obligated to resolve the broader question of whether the disability was nonetheless employment-bred," because "petitioner presented sufficient testimonial evidence of the lifting requirements of her work to generate a potential connection between the work-related activity and the disability"); *Murray,* 765 A.2d at 985 (ALJ's re-

---

7. Petitioner reported a variety of symptoms: coughing; sneezing; tight chest; hoarse voice; burning nose; racing heart; difficulty sleeping and restlessness; itchy, swollen, cracked and dry lips; stuffy/running nose; labored respiration; shortness of breath; difficulty concentrating; constant fatigue/lethargy; muscular weakness; tremors in her hands and twitching of her eyelids; headaches with changes in visual acuity and blurred vision; short-term memory loss; heart palpitations; severe rashes all over her body; swollen eyes; feeling hot; mood swings; numbness and tingling; flu-like symptoms; hair loss; abnormal weight gain; and night sweats. Although petitioner testified that she had cognitive and neurological symptoms from the outset, she did not report these symptoms to the physicians that she saw early on.

8. As we said in *Ferreira,* "the etiology of some disabilities is often difficult to pinpoint" and the "informality and flexibility purposely animating the procedures governing workers' compensation claims and the agency's participatory role in the fair adjudication of these claims militate against the formalism DOES exhibited here." 531 A.2d at 658, 658 n. 7.

We note that while petitioner told doctors that she had been exposed to mold, her counsel, in his opening statement at the hearing before the ALJ, urged that "[i]t's unclear if anyone can truly tell us what she was exposed to, other than the fact that it was particulate matter. It may have been mold, it may have been something else."

jection of claim that a discrete incident on the job caused claimant's hip injury did not relieve the ALJ from considering whether claimant's job duties that required "twisting, bending, reaching, and pulling" might have caused the injury).

In sum, we hold that the evidence described above kept alive the statutory presumption of a causal relationship between the adverse symptoms that underlie petitioner's disability claim and the July 6, 2002 workplace incident. Accordingly, the ALJ's inquiry "should have been focused on whether the employer provided 'substantial evidence' of a nonemployment related basis to sever the potential employment connection." *Ferreira*, 531 A.2d at 659.

Moreover, the ALJ was required to recognize that a claimant can demonstrate a work-related disability by showing that her adverse symptoms return when she returns to her workplace even if her symptoms otherwise are resolved or under control. *See Howard*, 881 A.2d at 573 ("[W]here a claimant's allergic condition arises out of and is causally related to her employment, she continues to suffer from a compensable disability so long as she cannot return to her job ... or obtain a monetarily equivalent job ..., even if her allergic symptoms have subsided and the only thing that prevents her from going back to work is the danger that her symptoms will recur if she does."); *Wash. Post*, 853 A.2d at 707 (holding, in a case where claimant press operator developed an allergic reaction to a chemical used in the printing process, including a rash that subsided when she stopped working but re-

appeared when she returned to work, that "[w]hen an allergy develops for the first time at the workplace, it is identical to any other work-related injury").[9]

Here, the ALJ credited at least some of petitioner's testimony about her adverse symptoms during July and August 2002, but made no specific finding about whether the symptoms could be expected to return if petitioner had resumed working at the Hospital during the March 14, 2003 to February 11, 2004 period that is in dispute. Without such a finding, the ALJ's conclusion that petitioner had not established a disability that was causally related to the July 6, 2002 exposure was premature. We have rejected the assumption that a claimant "was not disabled within the meaning of the Workers' Compensation Act if all her ... symptoms truly have abated and she cannot return to her job at the Hospital only because she should not risk being re-exposed...." *Howard*, 881 A.2d at 573. Dr. Myerson's conclusion that "[t]here is no credible medical or scientific data which would link [petitioner's] *multi-system* complaints to the July 6, 2002 exposure to dust" (italics added)—a statement that did not negate his and several other doctors' previous assessments that petitioner had *some* symptoms that were related to environmental factors in the workplace—was not substantial evidence by which the Hospital could meet its burden of "showing that ... disability did not arise out of and in the course of [petitioner's] employment."[10] *Ferreira*, 531 A.2d at 655.

A remand is in order, so that guided by *Ferreira, Murray, Howard*, and

---

9. The Hospital argues that *Howard* and *Washington Post* are distinguishable from the instant case (which involves a diagnosis of reactive airway dysfunction syndrome) as cases in which the claimant's physician found that the claimant had an allergic reaction caused by a substance used at the workplace. The rele-

vant point, however, is that in both this and those cases, the claimant was told by physicians to avoid the offending workplace; we see no reason to draw a distinction on the basis of diagnosis.

10. We note, however, without deciding the issue, that Dr. Myerson's conclusion may

*Washington Post,* DOES can make findings as to whether, during the period in issue, petitioner had a disability that was causally related to the exposure she experienced on July 6, 2002, or that otherwise arose out of her employment at the Hospital. Upon remand, DOES may also address the issues it did not reach previously, such as whether petitioner voluntarily limited her income by pursuing work whose schedule would accommodate her home-schooling duties and other community activities.

For the foregoing reasons, the decision appealed from is reversed, and the matter is remanded to DOES for further proceedings not inconsistent with this opinion.

*So ordered.*

---

have a bearing on the resolution of petitioner's claim for recovery of expenses incurred for medical treatment for some of her multi-system complaints.