**WASHINGTON METROPOLITAN
AREA TRANSIT AUTHORITY,
Petitioner,**

v.

**DISTRICT OF COLUMBIA DEPART-
MENT OF EMPLOYMENT SER-
VICES, Respondent,**

and

**Hughey Payne, Intervenor.**

No. 08–AA–1207.

District of Columbia Court of Appeals.

Argued Dec. 2, 2009.

Decided April 15, 2010.

Mark H. Dho, Assistant General Counsel, with whom Carol B. O'Keeffe, General Counsel, and Mark F. Sullivan, Deputy General Counsel, were on the brief, for petitioner.

David M. Schloss, with whom Joseph H. Koonz, Jr., Washington, DC, was on the brief, for intervenor.

Peter J. Nickles, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, Donna M. Murasky, Deputy Solicitor General, and David A. Hyden, Assistant Attorney General, filed a statement in lieu of brief in support of intervenor.

Before FISHER and THOMPSON, Associate Judges, and BELSON, Senior Judge.

THOMPSON, Associate Judge:

In this case, petitioner Washington Metropolitan Area Transit Authority ("WMATA") has asked us to review a decision of the Compensation Review Board ("the Board"), upholding a determination by a Department of Employment Services Administrative Law Judge ("ALJ") awarding workers' compensation benefits to intervenor Hughey Payne, Jr. We have no difficulty affirming the Board's decision upholding the ALJ's finding that Payne was rendered temporarily totally disabled when the air conditioning at the Metro Station where he worked malfunctioned, exacerbating the symptoms of his pre-existing asthma. The Board's decision on

this issue is supported by substantial evidence in the record and is neither unreasonable nor contrary to law. However, we are constrained to reverse the portion of the Board's decision upholding the ALJ's determination that Payne has an ongoing compensable disability. As we explain, (1) by looking only to whether Payne presented "substantial evidence" of current disability, the ALJ applied an erroneous standard of proof; (2) in reviewing the ALJ's decision, the Board utilized a standard that was appropriate only if the burden of proof had been WMATA's (which it was not); and (3) Payne's evidence was not so strong as to enable this court to conclude as a matter of law that Payne met the applicable burden of proof (preponderance of the evidence). We therefore remand for further proceedings.

## I. Background

Payne began work as a WMATA Metro Station manager in 2000. While working at the Foggy Bottom station during the summer of 2005, he began experiencing trouble breathing because of the high heat and humidity inside the station and malfunctioning air conditioning. In December 2005, he requested a transfer to the Farragut West station. He was working there on August 29, 2006, when the air conditioning in the station stopped working and he became dizzy, faint, and very weak. He left work, and since that date has not returned, having been advised by his physician that he should avoid the "dirty, dusty, underground [subway] station," and that he needs "a clean work area without temperature extremes to avoid worsening of his asthma."

Payne timely filed a claim for disability benefits, asserting that the dusty, hot and humid atmosphere inside the Metro station aggravated his asthma. In an October 31, 2007 Compensation Order, the ALJ found that Payne suffered an accidental injury on August 29, 2006, that the injury arose out of and in the course of his employment, and that his physical condition "is medically causally related to the work incident." Specifically, the ALJ determined that Payne's "exposure to dust and excessive heat while working as a station manager aggravated his asthma." The ALJ also found that the medical evidence supported Payne's contention that "the work exposure to dust and heat prevented him from returning to work in the metro tunnels."

WMATA sought review by the Board. In a January 28, 2008 Decision and Remand Order, the Board concluded that the ALJ's finding that Payne sustained a compensable injury was supported by substantial evidence. The Board noted in particular that independent medical examiner ("IME") Dr. Samuel Scott, who is Board-certified in internal and occupational medicine, agreed with Payne's treating physician, pulmonologist Dr. Earl Armstrong, that Payne's "asthma symptoms are exacerbated by hot, humid conditions." The Board also concluded, however, that the ALJ had erred by not allowing testimony from an industrial hygienist who had been engaged by WMATA to study the current condition of the air quality in the Farragut West and Foggy Bottom Metro stations. The Board reasoned that the excluded testimony was relevant to "the present nature and extent of [Payne's] disability, if any." Noting that both Dr. Scott and Dr. Armstrong had opined that Payne could return to work but "should avoid dusty areas and extreme temperatures," the Board stated that without evidence about current air quality, it could not determine whether to uphold the ALJ's determination that Payne's disability is ongoing and "indefinite." As the Board later explained in its September 3, 2008 final decision in this case, "the issue of continuing disability rests upon whether the air quality contin-

ues to be such that it violates [Payne's] treating physician's proscription on working in 'dusty area' or in 'extreme temperatures.'" The Board remanded the case to the ALJ on the issue of whether WMATA "had offered [Payne] return to work in an environment within his medically imposed restrictions."

At the remand hearing before the ALJ, Dr. Neil Jurinski, the certified industrial hygienist retained by WMATA, explained that he performed a study of the air quality at the Foggy Bottom station on February 27, 2008, and the Farragut West station on February 28, 2008.[1] He testified that the dust levels inside the Metro stations were approximately one one-hundredth of the limit set by the Occupational Health and Safety Administration ("OSHA"),[2] and that the level of dust outdoors near the stations was only slightly lower than the levels underground in the station managers' kiosks and in the subway platform areas, making the air quality in the outdoors and underground areas essentially "equivalent." Dr. Jurinski was aware of no study "that would associate the induction of a respiratory disease at this level of exposure."

In his April 30, 2008 Compensation Order on Remand, the ALJ again found that Payne's "condition continues to render him totally disabled." The ALJ explained that Dr. Jurinski's testimony did not address the current level of Payne's disability because Dr. Jurinski "could not provide a medical opinion regarding Claimant's ability to return to work" and because "[n]o physician ha[d] reviewed" his findings. The ALJ reasoned that "it would be highly speculative to conclude that the dust levels

found in the metro tunnels were not of a sufficient level to prevent [Payne] from returning to work."

The ALJ also noted that Dr. Jurinski's analysis of dust levels did not consider other environmental factors, such as temperature. The ALJ noted that Payne's physicians had stated that he "could not perform the requirements of the station manager position due to exposure to hot and cold temperatures." The ALJ observed that WMATA had not taken steps to rehabilitate Payne for alternative employment and had not offered Payne employment "consistent with his medical restrictions."

In a September 3, 2008 decision, the Board affirmed the ALJ's decision that Payne's disability was ongoing. The Board reasoned:

> What is missing from the record is whether the results of the air quality studies are or are not what Respondent's treating physician calls "dusty." The ALJ concluded, by inference at least, that the uncontradicted testimony of Dr. Jurinski described above did not constitute testimony sufficient to demonstrate that the air in the Metrorail stations was not impermissibly "dusty." As the ALJ put it, "No physician has reviewed the findings of Dr. Jurinski, and thus it would be highly speculative to conclude that the dust levels found in the metro tunnels were not of a sufficient level to prevent Claimant from returning to work." This is the central crux of the decision of the ALJ. While we do not necessarily agree with the ALJ that a finding that air quality that

---

1. Dr. Jurinski testified that air samples were collected using a sampling pump that was worn by station managers in their shoulder areas as they performed their regular duties on those dates.

2. According to Dr. Jurinski, the OSHA standards "are based upon evaluation of the health effects and the dosages that are required to produce those adverse health effects."

exceeds by a factor of 100 the permissible OSHA standards for "dust" is insufficient to find, without undue speculation, that such air is not in any sense of the word "dusty," nor do we agree with what is at root the argument of Petitioner in this appeal, that such evidence compels, without more, a conclusion that the air is sufficiently dust-free to permit this worker to return to this environment. While it is true that the testimony of Dr. Scott, the IME physician, that dust levels meeting the OSHA standards would not be expected to cause Respondent to be excluded from a worksite, that testimony was premised upon Respondent's condition being "controlled by medication," . . . a precondition that presumes a circumstance not otherwise demonstrated to exist at this time. Further, Dr. Scott's opinion on this is an IME opinion, and we do not have a similarly specific opinion from Dr. Armstrong, the treating physician.

Summarizing its conclusion, the Board stated that "[b]ecause the reports and testimony of Dr. Jurinski merely permit, but do not compel, a conclusion that [Payne] could return to work without being exposed to dust beyond the limits imposed by his treating physician, the determination by the ALJ that they do exceed those limits is not an abuse of the ALJ's discretion as fact finder, and the award of continuing disability is affirmed." The Board found that the conclusion that Payne "remains disabled" was supported by "substantial evidence."

WMATA's petition to this court, for review of the Board's rulings as to both causation of "the initial disabling episode" and ongoing disability, followed.

## II. Standard of Review

"In a workers' compensation case, we review the decision of the Board, not that of the ALJ. . . . In doing so, however, we cannot ignore the compensation order which is the subject of the Board's review." *Georgetown Univ. Hosp. v. District of Columbia Dep't of Employment Servs.*, 916 A.2d 149, 151 (D.C.2007) (internal citation omitted). The role of the Board is "limited to a review of the decision of a hearing examiner to determine whether the examiner's findings are supported by substantial evidence in the record and to determine whether the legal conclusions drawn by the examiner are in accordance with applicable law." *Washington Metro. Area Transit Auth. v. District of Columbia Dep't of Employment Servs.*, 926 A.2d 140, 147 (D.C.2007) (citations and internal quotation marks omitted). "To the extent that the [Board] properly conducts its review of the decision of the ALJ, we will affirm the ruling unless it is arbitrary, capricious, or otherwise an abuse of discretion and not in accordance with the law." *Id.* (citations and internal quotation marks omitted). We will not affirm an administrative determination that "reflects a misconception of the relevant law or a faulty application of the law." *Georgetown Univ. v. District of Columbia Dep't of Employment Servs.*, 971 A.2d 909, 915 (D.C.2009) (citation and internal quotation marks omitted).

## III. Analysis

### A. Whether Payne Sustained a Compensable Injury

"In the District of Columbia, there is a statutory presumption that a claim for injuries suffered by a worker on the job comes within the provisions of the [Workers' Compensation] Act, absent evidence to the contrary." *Murray v. District of Columbia Dep't of Employment Servs.*, 765 A.2d 980, 983 (D.C.2001); *see* D.C.Code § 32–1521(1) (2001). To take advantage of the presumption of compensability, "a

claimant must make an initial showing that he or she sustained injuries and a work-related event that has the potential of contributing to the injuries.... Once this minimal initial showing is made, the presumption establishes a causal connection between the claimant's injury and the work-related event...." *Jackson v. District of Columbia Dep't of Employment Servs.*, 955 A.2d 728, 732 (D.C.2008) (internal citation omitted). If the presumption is triggered, the burden shifts to the employer to "bring forth substantial evidence showing that the ... disability did not arise out of and in the course of employment." *McCamey v. District of Columbia Dep't of Employment Servs.*, 947 A.2d 1191, 1199 (D.C.2008) (en banc) (citation and internal quotation marks omitted). To rebut the presumption, the employer's evidence must be "specific and comprehensive enough to sever the potential connection between the disability and the work-related event." *Washington Metro. Area Transit Auth. v. District of Columbia Dep't of Employment Servs.*, 827 A.2d 35, 42 (D.C.2003) (citation and internal quotation marks omitted).

█ In this case, employer WMATA does not dispute that Payne's evidence was sufficient to trigger the presumption of compensability, but it contends that it offered substantial evidence that was sufficient to rebut the presumption of a causal connection between Payne's August 29, 2006 asthma attack and the failure of the Farragut West HVAC system to work properly on that day. We are satisfied that substantial evidence supports the Board's decision to uphold the ALJ's finding that WMATA failed to rebut the presumption that Payne was rendered disabled by a workplace event.

The record evidence that was before the ALJ included opinions from both Payne's treating physician, Dr. Armstrong, and the IME, Dr. Scott, that Payne suffered from asthma and that he should avoid extremely hot and humid conditions. Dr. Scott opined that "most people who are asthmatic tend to find ... they have more difficulty when the air is hot and humid." Though stating that Payne's asthma is "without a clear etiology," Dr. Scott agreed that his "asthma symptoms are exacerbated by hot, humid conditions." Further, it was uncontradicted that the Farragut West HVAC system malfunctioned on August 29, 2006, the day Payne reported feeling dizzy, faint, very weak, and had difficulty breathing. As the ALJ noted, a WMATA station manager's log for August 2731, 2006, contained entries indicating that the platform chiller at Farragut West "was not working as well" and that the station mezzanine area was "very hot." WMATA attempted to show that the temperatures inside the Farragut West station were not extreme enough to have exacerbated Payne's asthma by pointing to station temperature logs that showed temperatures at or below 86 degrees Fahrenheit on dates in August 2006,[3] and also showed, for the same dates, that temperatures inside the station consistently were lower than outside temperatures, sometimes by as much as 10 to 15 degrees. However, WMATA's logs contained no temperature reading for August 29, 2006, the day Payne became ill. In addition, as the ALJ observed, the temperature log readings were for "various air conditioner units" and thus did not purport to show what temperatures were at all places within the station. In light of all the foregoing, the ALJ could reasonably

---

**3.** Dr. Armstrong had opined that Payne must "avoid extremes of temperature over 90 [degrees] F[ahrenheit] and less than 35 [degrees] F[ahrenheit] because these also worsen his breathing."

find that WMATA's evidence was not sufficiently "comprehensive and specific" to rebut the presumption that excessive heat at the Farragut West station on August 29, 2006, exacerbated the symptoms of Payne's asthma and rendered him temporarily disabled. Accordingly, the Board did not err in upholding the ALJ's determination.[4]

## B. Whether Payne Has an Ongoing Disability

■ The ALJ correctly recognized that Payne was "not entitled to a presumption regarding the nature and extent" of his claimed disability. *See Golding–Alleyne v. District of Columbia Dep't of Employment Servs.*, 980 A.2d 1209, 1213 (D.C.2009) ("On the question of the nature and extent of [her] disability, . . . the claimant is not entitled to any presumptions.") (citation omitted); *Hiligh v. District of Columbia Dep't of Employment Servs.*, 935 A.2d 1070, 1075 (D.C.2007). However, the ALJ erroneously stated that Payne's burden was only to "present substantial credible evidence that he has a disability entitling him to the requested level of benefits." In fact, "the correct burden of proof is a preponderance of the evidence." *Washington Metro. Area Transit Auth.*, 926 A.2d at 149; *see also Golding–Alleyne*, 980 A.2d at 1215–16 ("The claimant had the burden of proof when presenting her case to the ALJ, and she must prove her case by a preponderance of the evidence. . . . Merely presenting 'substantial evidence' to support [a] claim is not necessarily enough to carry the burden of persuading the finder of fact.").

Having misapprehended Payne's burden of proof, the ALJ made no finding as to whether Payne proved by a preponderance of the evidence that his disability was ongoing. For its part, the Board overlooked the ALJ's articulation of an incorrect standard and his failure to weigh the parties' evidence under the applicable preponderance-of-the-evidence standard. Notwithstanding, if the Board had concluded as a matter of law that the evidence was so one-sided that it would have been unreasonable for the ALJ to find that Payne had failed to prove his ongoing disability by a preponderance of the evidence, the Board could properly have upheld the ALJ's determination. But the Board never made such a legal determination. Quite the contrary, the Board's analysis implies that WMATA bore the burden of proof, because the Board invoked a review standard that applies when the party with the burden of proof has petitioned for review. In reasoning "nor do we agree . . . that [WMATA's] evidence compels . . . a conclusion that the air is sufficiently dust-free to permit this worker to return to [the work] environment," the Board employed a test that this and other courts have used in analyzing a claimant's contention that the hearing officer erred in finding that the claimant did not meet his burden of proof as to disability. *See id.* at 1216 (applying the rule that "[w]hen an agency concludes that the party with the burden of proof failed to meet that burden, we will reverse that determination only if the record compels a contrary conclusion to the exclusion of any other inference") (quoting *Douglas v. Board of Trs. of the Me. State Ret. Sys.*,

---

**4.** This is so even if Payne's asthma was a preexisting condition. *See Clark v. District of Columbia Dep't of Employment Servs.*, 772 A.2d 198, 202 (D.C.2001) ("It is well established that in the District of Columbia, a disability resulting from the aggravation of a pre-existing condition is compensable under the [WCA] . . . .") (citation omitted); *Jackson*, 955 A.2d at 734 n. 7 ("[B]ecause aggravation of a preexisting injury is compensable, it does not matter whether that preexisting injury was itself work related.").

669 A.2d 177, 179 (Me.1996)).[5]

■ We could avoid a remand if we were able to make a legal determination that the evidence compelled a determination that Payne met (or failed to meet) his burden of proof as to his claim that workplace conditions prevent him from returning to work. However, in our judgment, the evidence does not so clearly favor either side that we can make such a determination. As we explain below, this is true as to both the evidence about "dust" and the evidence about temperature extremes.

In addition to Payne's own testimony about dust in the workplace, the ALJ had before him numerous statements by Dr. Armstrong about Payne's inability to tolerate dust at the Metro station. For example, on December 21, 2006, Dr. Armstrong opined that Payne "must be relocated away from the dusty, dirty underground Farragut West 18th Street station."[6] On September 17, 2007, Dr. Armstrong recommended that Payne continue to stay away from "the dusty environment of the Metro Tunnels." While Dr. Armstrong stated that "any outside station is acceptable" as a workplace environment for Payne, evidence was offered and the ALJ found that station managers choose Metro stations according to seniority, with the result that Payne could not be guaranteed the choice of an open-air outdoor station. Although Payne had not returned to work since August 29, 2006, to test his reaction to the underground station, he testified that he rode the subway to his lawyer's office and to the hearing, and that "I cough and I can tell that I have to use my inhaler after I use it because there's just something in the dust that gets—that chokes me."

---

5. *See also Finance & Admin. Cabinet, Dep't of Revenue v. Slagel*, 253 S.W.3d 74, 76 (Ky.Ct. App.2008) ("Where an administrative agency's decision is to deny relief to the party with the burden of proof or persuasion, ... the issue on appeal is whether the evidence in that party's favor is so compelling that no reasonable person could have failed to be persuaded by it.") (emphasis omitted); *Dale v. S & S Builders, LLC*, 188 P.3d 554, 561 (Wyo. 2008) ("If the hearing examiner determines that the burdened party failed to meet his burden of proof, we will decide whether there is substantial evidence to support the agency's decision to reject the evidence offered by the burdened party by considering whether that conclusion was contrary to the overwhelming weight of the evidence in the record as a whole."); *Sheth v. State ex rel. Wyo. Workers Comp. Div.*, 11 P.3d 375, 382 (Wyo.2000) ("[W]e conclude that the hearing examiner's finding that [claimant] failed to establish unsafe levels of carbon monoxide is not clearly contrary to the overwhelming weight of the evidence.").

6. Similarly, on September 1, 2006, Dr. Armstrong stated that Payne's respiratory illness "was worsened by Black Brake Dust Exposure" and that Payne "needs relocation to less irritating job site." In a September 11, 2006 letter, Dr. Armstrong recounted Payne's complaint about the "dusty environment" at Farragut West and that he was "not able to tolerate the train brake dust and extreme summer heat, stating that it worsens his asthma and his sinusitis." On February 1, 2007, Dr. Armstrong wrote that Payne suffered from asthma "worsened by the dirty, dusty underground exposures" at Farragut West and would not be able to return to "the same dirty, dusty, underground station" for an "indeterminant" amount of time. On April 13, 2007, Dr. Armstrong wrote that he was treating Payne for allergic asthma and rhinitis, caused by "allergies to inhaled irritants—years duration[.]" Also on that date, Dr. Armstrong stated that Payne's "shortness of breath is aggravated by the underground, poorly ventilated environment at Farragut West" and that Payne must avoid "whatever level of [dust exposure] irritates his lungs" and required "[r]elocation away from Farragut West[.]" On September 17, 2007, Dr. Armstrong wrote that "[i]deally [Payne] should be assigned to a clean work area without temperature extremes to avoid worsening of his asthma which is permanent and lifelong[.]"

As WMATA argues, however, Dr. Armstrong's statements sometimes were tentative, often were vague and non-specific about Payne's environmental restrictions, and seem to be based largely, if not entirely, on Payne's own allegations about the dusty environment at Farragut West and its impact on him.[7] In his September 11, 2006 letter, Dr. Armstrong stated that when he first saw Payne on May 15, 2006, Payne complained about the "dusty environment at the Metro Station," and was given "a note to take to Metro *suggesting* that his asthma and respiratory illnesses were worsened by the dust exposures at the Farragut West 18th Street Station and that he needed to be relocated to less irritating job sites." (italics added). By contrast, Dr. Armstrong's almost-contemporaneous note about the May 15, 2006 visit states that he diagnosed Payne as having "allergies to pollen with chest tightness and wheezing."[8] Asked what he meant by the "dust exposure" that worsened Payne's asthma, Dr. Armstrong answered "all airborn [sic] irritants that he must breathe into his lungs." Asked whether there was a "minimum or measurable level of dust exposure" that Payne must avoid, Dr. Armstrong answered, "whatever level irritates his lungs."

WMATA presented evidence, via the testimony of IME Dr. Scott, that "the only way one would know [whether Payne's symptoms were related to dust] would be to do an industrial hygiene survey to see what his exposure actually is." Dr. Scott was asked, "If a person is affected by dust and you are given reports indicating [that] a certain work area meets the OSHA standards as far as the air sampling and the air quality, would that person be released, in your opinion, to work in that environment?" He answered, "[I]f you had data to show that your dust levels were low, then it certainly would not be the dust that's causing the problem."[9] He testified that the OSHA standard as to dust levels is a "pretty good guideline" as to whether there is excess dust. Through Dr. Jurinski, WMATA presented the results of an industrial hygiene study. As already described, Dr. Jurinski testified that the dust levels at both the Farragut West and Foggy Bottom stations were well below OSHA limits. Since Dr. Jurinski supplied the industrial-hygiene report that Dr. Scott indicated would mean that the dust levels in the station met Payne's medical restrictions, the ALJ could not properly discount Dr. Jurinski's testimony on the sole

7. *Cf. Sheth,* 11 P.3d at 381 (explaining that although claimant's doctors opined that carbon-monoxide exposure at the workplace could be a contributing cause of claimant's heart attack, neither doctor was aware of the level of carbon-monoxide exposure and there was no evidence establishing that the claimant was in fact exposed to unsafe levels of carbon monoxide while at work, and concluding that claimant therefore could not establish his entitlement to benefits).

8. Further, while Dr. Armstrong opined that Payne suffers from "allergic asthma," Dr. Ali Abrishami, who evaluated Payne around October 27, 2006, wrote that "[i]t appears that [his] shortness of breath is unrelated to asthma" and that "[a]llergy skin testing with ma-

jor aeroallergens prevalent in this area revealed moderate sensitivity to dust mite only."

9. Contrary to the Board's reasoning, Dr. Scott's testimony on this point was not premised upon Payne's condition being "controlled by medication." His "controlled by medication" testimony was as follows: When asked, "If Mr. Payne's condition can also be controlled by medication, would he be able to work in the areas that may have higher levels of dust than normal?," Dr. Scott responded, "[I]f his symptoms are controlled, then I wouldn't see any problem, although if you do determine that the levels of dust are higher than what OSHA recommends, then I would—certainly would not put him in there, no."

ground that Dr. Jurinski himself was not a medical doctor and that no physician had reviewed Dr. Jurinski's findings.[10]

Regarding the temperature environment in the Metro stations, Dr. Armstrong stated on September 1, 2006, that Payne's respiratory illness was "worsened by ... unbearable heat (nonfunctional air cond[itioner])."[11] Dr. Scott determined that Payne "is able to return to work as a station manager as long as the HVAC system where he is working—is functioning properly." According to Dr. Scott, when he examined Payne on November 30, 2006, Payne, too, said that he believed "he could work as long as there was someplace he could go where the HVAC system worked." But the evidence was conflicting regarding whether the workplace would continue to expose Payne to excessive heat (or cold).

WMATA's evidence was that the August 29, 2006 air-conditioner malfunction that Payne described was fixed the next day. As already described, WMATA also introduced an exhibit showing August 2006 air temperatures well below the 90–degree temperature that Dr. Armstrong identified as the temperature above which the heat was too extreme for Payne to work. WMATA emphasizes the evidence that Payne experiences his claimed difficulties with temperature extremes even outside the workplace, including his testimony that he sometimes can't catch his breath when he gets out of the shower, that he almost passed out while working in his yard in the cold of December, that he has canceled doctor's appointments because of the weather, and that he "normally [doesn't] go out until the afternoon" to avoid temperature extremes and sometimes cannot "leave [his] house because of the heat." Although this evidence would not necessarily favor WMATA if Payne's sensitivity to temperature extremes had developed ab initio in the workplace, the ALJ did not so find. Rather, as the Board explained, the ALJ made no finding that Payne's "pulmonary condition was caused ab initio by his employment, or that the condition was worsened as a permanent medical matter (i.e., rendered worse in the sense that the exposure causing the disability made respondent more susceptible as a general

10. And, while it is true that "medical conclusions of treating physicians [such as Dr. Armstrong] are given preference," *Velasquez v. District of Columbia Dep't of Employment Servs.*, 723 A.2d 401, 405 (D.C.1999) (citations omitted), the ALJ was not entitled to disregard entirely the IME's testimony.

At the same time, the ALJ was not bound to accept Dr. Jurinski's findings or to draw from them the inference that Dr. Scott opined would be warranted. For one thing, Dr. Jurinski acknowledged that he did not evaluate whether "something else other than dust" might have affected Payne's ability to work. *Cf. Consol. Papers, Inc. v. Dep't of Indus., Labor & Human Relations*, 76 Wis.2d 210, 251 N.W.2d 69, 75 (1977) (explaining that the fact-finder in a workmen's compensation case was not required as a matter of law to credit the findings of a study that showed that the level of a particular fungus in the paper mill

where claimant worked was no higher than the level of the fungus in outside locations used for comparison, or to conclude that workplace exposure to the fungus played no role in worker's disease). Moreover, this court has cautioned against "any assumption that, because a substance present in [a work environment] may not have been at dangerous or unhealthful levels for the general public, the substance could not cause an adverse reaction in a particular claimant." *Young v. District of Columbia Dep't of Employment Servs.*, 918 A.2d 427, 432 (D.C.2007) (citations and internal quotation marks omitted).

11. On September 18, 2006, Dr. George Bone, another treating physician, documented Payne's complaint that the air conditioner was not working at the Farragut West station and that Payne "was having chest pains, burning sensation [and] sore throat."

matter to such exposures than he had been previously, or that the workplace exposure heightened Respondent's preexisting sensitivity to exposure to dust or heat)." [12]

Payne relies on WMATA's job description for station managers ("Physical Requirements for Station Managers"), which specifies that station managers "may be required to spend prolonged periods of time exposed to hot and/or cold weather." In addition, Payne testified that "the air conditioner never worked," that the August 29, 2006 incident was not "just an isolated incident," that there were air conditioner "failures for six months at Foggy Bottom," and that he "made continuous complaints at Foggy Bottom about the station air conditioner and they never repaired it." He testified that regardless of the WMATA exhibit showing air temperatures, he frequently found himself "wringing wet" with perspiration while at work, because sometimes, when the station is crowded after a train has arrived, "you feel like you're in a tropical zone," while in the mornings and at night, the station is "freezing."

It was the role of the ALJ to be the sole judge of where the preponderance of the evidence lay, i.e., to weigh the evidence that we have summarized and other evidence in the record and to determine whether or not the preponderance of the evidence supported a finding of ongoing disability. Because the ALJ did not make a preponderance finding, and because we cannot say that the evidence compelled a finding one way or the other, a remand is necessary, so that the ALJ can make the necessary finding.[13] *Cf. Logan v. District of Columbia Dep't of Employment Servs.*, 805 A.2d 237, 239, 240 (D.C.2002) (concluding that where the hearing examiner's analysis of the nature and extent of a claimant's disability "reflect[ed] confusion as to the correct allocation of the burden of proof," the court could not determine "whether conclusions legally sufficient to support the decision flow[ed] rationally from the findings," and thus a remand was necessary "for further consideration" of the evidence by the examiner under the proper standards (quoting *Pickrel v. District of Columbia Dep't of Employment Servs.*, 760 A.2d 199, 203

---

**12.** Rather, the Board noted, the ALJ found Payne's injury "to be an exacerbation [on August 29, 2006] of a pre-existing pulmonary condition."

In concluding his analysis, the ALJ cited this court's holding in *Howard Univ. Hosp. v. District of Columbia Dep't of Employment Servs.*, 881 A.2d 567, 573 (D.C.2005), that "where a claimant's allergic condition arises out of and is causally related to her employment, she continues to suffer from a compensable disability so long as she cannot return to her job (or obtain a monetarily equivalent job), even if her allergic symptoms have subsided and the only thing that prevents her from going back to work is the danger that her symptoms will recur if she does." However, in the absence of a finding that conditions in the workplace were the cause or permanently worsened Payne's asthma or rendered him more susceptible to irritants, the principle that the ALJ cited was inappo-

site. *Cf. Washington Post v. District of Columbia Dep't of Employment Servs.*, 853 A.2d 704, 708 n. 3 (D.C.2004) ("Our analysis would be different, of course, if claimant already had an allergy to chloracetamide prior to working for petitioner."). Accordingly, the ALJ's reliance on *Howard Univ.* could not compensate for the ALJ's failure to weigh the competing evidence of an ongoing work-related disability under the preponderance-of-the-evidence standard.

**13.** We could resolve the matter ourselves if the result were "clearly ordained by law," since we are not required "to remand in futility." *Howard Univ.*, 881 A.2d at 574 (citation and quotation marks omitted). But where, as here, the question of ongoing disability depends upon the weighing of conflicting evidence, a remand is the appropriate course.

(D.C.2000) (citation and quotation marks omitted))). Accordingly, we affirm the determination that Payne was rendered temporarily disabled because of the August 29, 2006 incident; but, on the issue of ongoing disability, we remand this matter for further proceedings not inconsistent with this opinion.

*So ordered.*